STATE OF IOWA, Appellee, v. J. T. McCASKILL, Appellant.

**Criminal law:** MURDER: EVIDENCE. On this prosecution for murder
1 the evidence, while in sharp conflict, is held to require submission of
the case to the jury.

**Same:** INTENT: BURDEN OF PROOF: INSTRUCTION. Where the defend-
2 ant's evidence tended to show that the second revolver shot which
killed deceased was unintentional and resulted from a struggle of
the parties, it was incumbent on the court in submitting this issue
to instruct the jury, not only that this affirmative defense must be
shown in the first instance by the defendant, but also that to sustain
conviction the evidence for the state upon the whole case must estab-
lish beyond a reasonable doubt that the fatal shot was intentionally
fired.

**Same:** SELF-DEFENSE. Where defendant accused of murder sought the
3 deceased with intent to provoke a difficulty or bring on a quarrel,
he cannot claim that the crime was committed in self-defense.

**Same.** While a prompt surrender of defendant to the authorities may
4 be considered in determining his guilt, no presumption in support
of a claim of self-defense arises from that fact.

**Same:** EVIDENCE: QUARRELSOME DISPOSITION. Evidence that deceased
5 was a quarrelsome man, of violent temper and disposition, was com-
petent on the question of whether he was the aggressor in the affray
resulting in his death, regardless of whether it appeared that he
provoked disputes and quarrels.

*Appeal from Blackhawk District Court.*—HON. FRANKLIN C.
PLATT, Judge.

TUESDAY, JULY 1, 1913.

INDICTMENT for murder. From sentence of imprison-
ment upon a conviction of manslaughter, defendant appeals.
—*Reversed.*

*Edwards & Longley* and *Dawley & Wheeler*, for appellant.

*George Cosson*, Attorney General; *John Fletcher*, Assistant Attorney General; *Wirt P. Hoxie*, County Attorney, and *E. H. McCoy*, Assistant County Attorney, for the State.

WITHROW, J.—I. The deceased, Henry Phillips, was killed by the defendant, McCaskill, in the kitchen of his own home, on his farm in Blackhawk county, Iowa, on the 22d day of November, 1911. The deceased was, at the time of his death, sixty-three years of age, about five feet ten or eleven inches tall and weighed between one hundred and eighty and two hundred pounds. He was a large, muscular man, in perfect physical condition, so far as the appearance of his body would indicate. The defendant was about thirty years old, a native of the state of Texas, and was employed in the business of delivering sewing machines to farmers through the country. He was about five feet seven or eight inches in height, weighed about one hundred and forty-five pounds, and, as he stated, had been in bad health with stomach trouble for about five years.

1. CRIMINAL LAW: murder: evidence.

Upon the day of the death of Mr. Phillips, and for some time prior thereto, the defendant had been engaged in making deliveries of sewing machines, for which written orders had been previously taken by other employees of their common employer, and his headquarters had been at Jesup, about seven miles east of Henry Phillips' farm. On the day in question the defendant had started in the morning with his team and wagon and two machines for delivery to purchasers, one to the deceased, Mr. Phillips, and one to some other person. In addition to the machine on his wagon, he carried a small leather satchel containing some sewing machine tools, some cloth for use in demonstration and instruction of the machine, and a .38 caliber Smith & Wesson Special revolver. He had

carried this satchel with this equipment in it for some time, and, as he explained, carried the revolver because he frequently had large sums of money in his possession, and often was compelled to drive at night as well as in the daytime, and always alone.

The Phillips home stood something like one hundred and fifty feet south of the highway which ran east and west. It was reached from the highway by driving through a gate in the highway fence into the barnyard and up to a gate which opened from the house lot proper into the barnyard, divided by a fence running north and south from the highway fence. The house fronted east on the barnyard, and was set back from the north and south fence a few feet.

McCaskill arrived at the home of Mr. Phillips about 9:30 in the morning. Both Mr. and Mrs. Phillips were absent, and only the two younger children, Susie, fourteen years of age, and Henry, fifteen years of age, were there at that time. He told Susie that he was there with a machine for her father, and proposed bringing it into the house, which he did. The contract for the sale of the machine required the taking in of the old machine as a part of the price of the new machine. The old machine was then taken out and put on McCaskill's wagon by him, and the new one taken into the house. Susie telephoned her father, and informed defendant that her father had said he would be home about noon. The defendant said for her to tell her father he would be back about one o'clock, and then proceeded to instruct Susie in the use of the machine. He then left the house, driving away with the old Phillips machine on the wagon.

He returned to the Phillips house about one o'clock in the afternoon. He drove his team in at the gate at the highway and up to the hitching post, which stood north from the gate from the house lot into the barnyard, and hitched the team, which, as it stood at the hitching post, was headed south and slightly to the west. The defendant walked through the gate to the kitchen door, was invited in by Susie, and informed

that her father was in the front room.  The defendant walked through the kitchen into the room where Mr. Phillips was sitting in his chair near the stove.  The defendant wore his heavy fur overcoat, and carried the satchel containing the sewing machine tools and the revolver.  He set the grip down, walked over to Mr. Phillips, introduced himself as McCaskill, shook hands, and stepped back to pull off his overcoat, saying that he had delivered the sewing machine in the forenoon, and had instructed his daughter Susie how to use it.  Defendant testified that the deceased immediately applied to him vile epithets, criticised him for having put the machine into the house without his permission, and said that he would make him take out the new machine, and bring back the old machine.  At the same time, as defendant claims, Phillips picked up, from under the stove, an iron fire poker, which he raised and started towards the defendant, motioning with the poker in a threatening manner, and threatening that he would kill the defendant or make him put the old machine back into the house.

The defendant had removed his overcoat, and as the deceased started toward him with the poker he picked up the little grip, ran for a few steps, went back through the door from the dining room into the kitchen, out the kitchen door and east down the walk, through the gate to his team, with the defendant following him, during all of that time threatening him.  The defendant went past the heads of the horses to the east, turned to his left as he passed the head of the near horse, walked along by the team and along the spring wagon until he got to the old machine.  Defendant testified he reached for the screw plate, which held the machine on the wagon, to loosen the machine, but that the deceased kept coming toward him, and calling him names, threatening him with the poker, and defendant said to the deceased, "There is your machine, take it," and that the deceased then called to Henry to come and get it.  The deceased himself did not stop, and the defendant continued up on the west side of

the wagon to the heads of the horses, with the defendant still following, at which point the defendant got the grip open, pulled out his revolver, and stepping past the head of the horses again, and to the southeast, he presented the gun toward the deceased, and told him to stop. The deceased did stop. The defendant asked that Phillips permit him to get his things out of the house, to which the deceased said, ''Come on and get your things.'' Mr. Phillips then turned, walking back to the kitchen door, followed by the defendant about two feet behind, and as they walked back toward the kitchen door the defendant said to the deceased: ''You roll my machine out of the house, put my overcoat out of the door, and I will take your machine off the wagon, and set it up there, and cancel your order.'' To which, as defendant, claims, the deceased replied: ''If you want your things, come in and get them. I didn't put them in there, and if you want them, come on, and get them yourself. I am a man of my word, and I ain't going to touch you.'' They proceeded until the kitchen door was reached, and the deceased stepped in in advance of the defendant, and put his hand on the doorknob, the door standing open, and turned, facing the defendant saying, ''Come in.'' The deceased turned his body as though starting to enter the dining room, and the defendant stepped up onto the kitchen floor, when the deceased, as defendant claims, moved and struck the defendant with the iron poker two or three times, so that the defendant was knocked to the floor. The defendant says he had been carrying his pistol in his right hand, with his left hand on one of the jaws of the little satchel, and the revolver held in his right hand shoved down into the grip. When he was knocked to the floor, he was dazed and blinded by the blows, and, believing his life in danger, by feeling of the legs of Mr. Phillips, he got his revolver pointed in the direction that he thought his body was in, and fired. This bullet entered the left leg of the deceased, above his knee and on the outside of his leg, and ran upward through the muscles of his leg, emerging

from the leg just below the groin, and going across the groin into the abdomen.

When the first shot was fired, the deceased caught the hands of the defendant in such a position that one of the hands of the deceased was over the right hand of the defendant, and behind and against the hammer of the revolver. In this position a struggle occurred, in which defendant says that he was raised up, and in the midst of the struggle, because of the fact that the deceased took his hand from behind the hammer of the revolver, and the gun, being a double-action gun, with the finger of the defendant upon the trigger, exploded, and the second bullet went through the body of Henry Phillips, entering at his sternum and out of his back. After the occurrence the defendant surrendered himself, making no attempt to escape.

The facts so far as presented are largely taken from defendant's testimony, that as to one branch of his appeal the record might be considered in its most favorable view.

The daughter, Susie Phillips, fourteen years old, testified:

Mr. McCaskill came to our house on the 22d day of November, 1911. He brought with him a new sewing machine, and stated that he had come to deliver it. The new sewing machine was brought into the house and the old one taken out and put on the wagon with the assistance of my brother Henry. My father and mother were away at my sister Mary's at this time. I rang up my mother to see if I should pay for the machine or sign a note for it. Father said if he couldn't wait until he got back he could keep the sewing machine himself. He would be back before noon. Mr. McCaskill then spent twenty minutes teaching me how to operate the machine. He didn't show me everything that I expected would be shown. I do not remember what it was he omitted to explain. I told my father about it when he returned. He said McCaskill would have to show everything that the other fellow did before he would take the machine. He lifted the machine, and said he didn't think

it weighed more than one hundred pounds, and he said the other man had stated that the machine would weigh one hundred fifty pounds. Mr. McCaskill came back after dinner, went into the house and shook hands with father. Father told him: 'The first thing I want you to do is to go out and bring in the old sewing machine, and I mean every word I say.' Mr. McCaskill then put his grip on the dining room table. Father told him again to go out and bring in that old sewing machine, and McCaskill said he wouldn't do it. Father then picked up the stove poker and said, 'If you won't go out and take in that old sewing machine, I will.' And father rushed and picked up the stove poker. McCaskill grabbed for his grip and ran out ahead of him. They walked fast out of the house, along the sidewalk, out to and around the east side of the buggy. I went into the dining room and looked out of the east window. They went around the buggy until McCaskill got to the head of the horses, when he took his revolver out of the grip. McCaskill was about ten feet ahead as they went around the buggy and to the heads of the horses. Father then turned back towards the house, with McCaskill following about ten feet behind him. I heard father come into the house. When they came back from the wagon I heard them come into the kitchen but did not see them. I then went into the dining room, where I could see into the kitchen and the kitchen door, and I saw father bracing his knee up against the doorknob, two hands against the door, and McCaskill stuck in the revolver around the door, which was not quite shut, and shot. I could see his hand and the revolver. Father's knee was above the doorknob and his hands above that. He had the stove poker in his hands. After the first shot McCaskill came in farther, and my father struck him two or three times with the fire poker. Mr. McCaskill got into the house, stood back and held up his hands. They were about four feet apart. I turned, and just after I turned I heard the report of the revolver. I waited a little while, then I went out through the kitchen. Father's feet were in front of the kitchen door, his head against the north corner of the cupboard.

The son, Henry, sixteen years old, testified:

Father said he wanted him to go and get the old sewing machine, and McCaskill said he wouldn't. Father got up,

and at the same time he picked up the stove poker, and told
him he would get it himself, if he wouldn't get it. McCas-
kill took his grip, and went out of the house through the
kitchen with father after him. They were walking. They
then went out towards the wagon walking fast, about nine
or ten feet apart. As McCaskill got in front of the horses he
took his revolver out of his grip. Father was following him
then. Father turned then to come towards the house, Mc-
Caskill following him. Father came into the house and
started to shut the door. McCaskill was about nine or ten
feet behind him when father pretty near had the door shut.
When McCaskill was about five feet from the door he made a
kind of a jump for it. The sidewalk is about four or five
inches lower than the kitchen floor. He leaned against it
with his hands against the door and his breast against his
hands. McCaskill let go one hand, pushed it behind the door,
which was seven or eight inches open, and shot. I think it
was the left hand. McCaskill did not have the grip in his
hands when he pushed against the door. McCaskill then
pushed farther in, the door giving away before him. As soon
as he got in, father started striking at him with the poker. I.
think he struck him two or three times, maybe four. I was,
at this time, standing about three or four feet southeast of
the kitchen door, where I could see right into it. McCaskill
was about a foot or half of a foot west of the door and about
a foot south when I saw him raise his hands and fire. I could
see both of his hands and his head, but I am not sure whether
I could see his shoulders or not. The gun was pointed east,
kind of northeast. I could see father at this time. As I
heard the shot go off I ran up to the door, looked around it,
and saw father lying there with his head against the cup-
board. His feet were near the door somewhere. I then ran
out of the house, and came back with Johnnie Ehr, and we
found father's pants burning a little. Ehr put it out. That
night I observed a mark on the edge of the door which was
about the size of a poker. I had never noticed it before. I
think it was McCaskill's left hand in which he held the re-
volver, but I can't say. I think it was McCaskill's left hand
in which he held the revolver when he fired the second shot.

On cross-examination he testified:

McCaskill came into the house in the afternoon with his overcoat on and his grip in his hand. He left his coat in the dining room. McCaskill walked very fast through the dining room and out into the kitchen, he looking back over his shoulder several times when father was following him with the poker in his hand. Susie and I were in the dining room as the men left the house. I didn't hear anything said between the two men until father called to me as they came back up along the sidewalk. Father was very mad. McCaskill reached around and fired the first shot. McCaskill's hand was about four of five inches above the doorknob as he fired the first shot. McCaskill just stepped into the kitchen after the first shot and I saw somebody hitting him over the head. I think I saw some of the blows land on McCaskill's head or shoulders. I did not speak to McCaskill when I was in the kitchen after the second shot.

There were no other eyewitnesses of the trouble than the three whose testimony in substance is above given.

II. In oral argument defendant's counsel presented to this court only the claim that the evidence did not warrant a conviction; and in their printed brief that proposition is fully discussed, together with other assignments of error.

Claim is made that the testimony of the children, Susie and Henry, is at such variance with physical and indisputable facts in the evidence that it cannot be considered, and that the facts and conditions which cannot be questioned are in such harmony with defendant's claim that a verdict of conviction cannot be allowed to stand. We refrain from a close discussion of the weight of the evidence and the credibility of the witnesses, for the reason that, as this cause must again be tried, we do not wish at this time to become triers of fact or record conclusions which might be used to the disadvantage of one party or the other in subsequent proceedings. It is necessary, however, for us to pass upon defendant's challenge as to the sufficiency of the evidence to uphold the verdict, and this will be done without discussing the credibility

and reasonableness of the testimony of some of the witnesses, which must be left to the jury. It is sufficient now to say that a careful reading of the record satisfies us that, while there was a sharp dispute as to many vital points in the case, it was properly left to the jury to determine the truth, and we cannot hold that its verdict is without support in the facts.

III. In instruction No. 17, the trial court instructed the jury:

It is claimed by the defendant that he went back to the house to get his overcoat which was left therein; that he went with the consent of Henry Phillips, but that as soon as he got inside the kitchen door that Henry Phillips assaulted him and knocked him down with an iron poker, and that he then fired the first shot in necessary defense, and that the second shot was unintentionally fired in the struggle that followed.

As to the right of self-defense and the burden of the state to overcome it the instructions were full, and correctly stated the law. Aside from instruction No. 17, as above quoted, no instruction was given referring to the claim that the second shot was unintentionally fired in the struggle; and the omission of the lower court in that respect is assigned as error. It is claimed by the state that the examination of the defendant clearly disclosed the fact that both shots were intentional; the first being claimed to have been in self-defense, and the second one the result of the same purpose, an immediate act following the first shot, and a part of the same transaction. In the evidence which we have set out the claim of the defendant as to an unintentional shot has some support. While perhaps not convincing, or indeed preponderating, it was yet in the case, and so recognized by the trial court in instruction No. 17. The intent with which the act was done was a necessary element in establishing a crime. In the absence of intent there would be no crime, unless under certain conditions not applicable here it resulted from negligence. If the fatal shot

2. SAME: intent: burden of proof: instruction.

was an accidental or unintentional one, as claimed by the defendant, such would prevent conviction; and upon the claim being made and being in the instruction recognized by the court as an element in the case, it was its duty to instruct the jury, not only that it was in the case, but also as to the burden of the state to prove that it was not unintentional. True, the jury was instructed as to its duty to find intent as a necessary element of the crime, but such related only to the nature and degree of proof required in establishing the crime charged in the indictment and the included crimes. It was not, in definite terms, told of the effect which must be given to an affirmative plea of want of intent. That plea having been stated to the jury, it was the duty of the court to instruct that while, in the first instance, such was an affirmative defense to be shown by defendant, yet if, on the whole case, there was a reasonable doubt as to whether the shot was unintentional, the jury could not convict. *State v. Matheson,* 142 Iowa, 414-417; Id., 130 Iowa, 440-450.

Instruction Nos. 19 and 20, asked by the defendant upon this question, were refused by the court. The idea of the right of the defendant to have such question submitted by proper instructions was presented, and while the court may not have approved their form, it should have given the rule to the jury, adopting such form as would definitely present defendant's right in this respect.

IV. The jury was instructed that if defendant returned to the house with the intention to provoke a difficulty, or to bring on a quarrel with Phillips, he could not then claim to
3. SAME: self-       have acted in self-defense, and of this the
   defense.          defendant complains. Such is the law. *State v. Benham,* 23 Iowa, 162; *State v. Stanley,* 33 Iowa, 526; *State v. McCurdy,* 81 Iowa, 614.

V. Error is charged in the refusal of the trial court to instruct the jury that evidence of prompt surrender by the

defendant is to be considered, as supporting the claim of the
defendant that he acted in self-defense, or
4. SAME.          that the shooting was unintentional. While
evidence of flight is admissible as tending to show guilt, it
does not follow that an instruction stating the rule invoked
by defendant should be given, although the fact is proper to
be considered by the jury in connection with all the other
evidence, in determining the question of guilt. Flight car-
ries to the mind evidence of guilt from the punishment for
which one would escape. Surrender may be a self-serving
act, or from other motives; but there is in the law no pre-
sumption arising from it.

VI. Evidence was introduced tending to show that de-
ceased, Phillips, was a quarrelsome man, of violent temper
and disposition, as bearing upon the question as to whether
5. SAME: evi-          he was the aggressor in the difficulty which
dence: quar-          resulted in his death. Witnesses also testified
relsome dis-
position.          that he was a peaceable man. His general
reputation as to being quarrelsome or peaceable was also tes-
tified to by a number of witnesses, presenting a question of
fact for the jury to determine, both as to his actual disposi-
tion and his general reputation. Upon this subject the
instructions given correctly stated to the jury the rules to
guide in considering and applying such evidence with the
exception of the last paragraph of instruction No. 23, which is
as follows: "Another rule is that a man cannot be said to
have a general reputation as a quarrelsome man, upon proof
that during the course of many years he may have had a few
quarrels with others, and where, as in this case, there is no
proof whatever that in any of such quarrels, if any, that Phil-
lips was at fault, or was the aggressor, you cannot find from
such evidence that he was a man of bad reputation as a quar-
relsome man."

There was evidence from which the jury might be war-
ranted in the finding that deceased was a man of quarrelsome
nature, based upon proof of general reputation. The quoted

instruction does not purport to be a qualification or application of that which preceded it, but is rather a statement of another rule governing testimony of the character under discussion. From it, however, the jury might naturally reach the conclusion that, although the evidence of general reputation showed deceased to have been a quarrelsome man, yet unless it were also shown that he was the agrressor in the quarrels upon which his reputation was based, it could not be found that he was a man of bad reputation as a quarrelsome man. Upon a careful study of the criticised instruction it is evident that the purpose of the trial court was to tell the jury that general reputation cannot be shown by occasional specific instances of quarrels. Nor can we agree with the thought contained in the instruction that, although one may have been in frequent or even occasional quarrels, that from such a bad reputation for quarrelsomeness could not be established, unless it also appeared that he was the aggressor in the several troubles. Such probably would be a fair statement of the rule as applied to one quarrel, but if the evidence tended to show frequent disagreements with others, it would be a question of fact for the jury to determine whether because of such, in the light of the circumstances, they showed a quarrelsome disposition; for frequent disagreements may fairly be considered as tending to show a man of contentious or quarrelsome nature. We think the instruction subject to the criticism of being not only misleading but erroneous.

VII. Other assignments of error presented by the defendant need not be considered. In the main they are so connected with or blended in others already considered that further discussion would not be helpful.

For the errors noted, the judgment of the trial court is *Reversed.*