## Cox v. Commonwealth.

(Decided Nov. 3, 1933.)

W. H. PHILLIPS and F. DOUGLASS CURRY for appellant.

BAILEY P. WOOTTON, Attorney General, and W. R. ATTKISSON, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing.

Indicted for murder, the appellant, Minnie Cox, was convicted of the offense of voluntary manslaughter and sentenced to serve twelve years in the penitentiary. She appeals.

Born in a remote section of Rockcastle county and early left an orphan, appellant has known naught else than poverty all her life. Spending her infancy and girlhood now with one charitably inclined relative and now with another, she grew to womanhood and in 1923 married. Her husband was, if anything, poorer than she. While she could in a fashion read and write, her husband was totally illiterate and, as pictured in this record, shiftless. Three children were born of this marriage, one of them just before the tragedy out of which this prosecution arose. She and her husband were drifters, drifting from one community to another, seeking a meager livelihood. They finally found their way to Mercer county, and there in the spring of 1932 they rented a shack on the Pennebaker Home Farm for Girls near Shakertown. This shack had at one time been a two-room weatherboarded house with a frame lean-to on the back; but time and decay had rotted off a large portion of the weather boarding and there was no glass in any of the windows, which appear to have been closed by rough wooden shutters. The house sat in a little yard around which ran a stone fence, and on this stone fence a bean rack for drying beans in the sun had been erected. The fence at the place where this bean rack was located ran from 26 inches to 3 feet in height. Beyond the stone fence, the ground led down to a gate through which ran a passway over to a more remote section of the farm. When appellant and her husband moved into this house, they had, save for their scant clothing, no other possessions except a chicken or two and a dresser. Robert Horn was the manager of this farm, and, when this couple moved in he lent them a bed, a table, and a stove, and, as appellant testifies, was

very kind to her and her husband up to the morning of this homicide. On September 5, 1932, Horn came over to the house where appellant and her husband were living, to borrow a hammer wherewith to repair the gate to which we have referred. Appellant's husband was off somewhere at work and she was alone in the house with her children. She readily lent the hammer to Mr. Horn, who seemed to be in a pleasant mood. He went down to the gate and repaired it. He then returned to the house with the hammer and gave it back to the appellant, who was in the shed formed in part by the lean-to on the back of the house. Mr. Horn thanked the appellant for her kindness in lending him the tool. Up to this point there is no dispute between the commonwealth and the appellant as to the facts. The commonwealth has no eyewitnesses to detail what next took place, but from circumstances undertakes to deduce this state of fact: After returning the hammer, Horn turned and walked away from the house, crossed over the stone wall fence that ran around the yard in which the house was located, and made his way down towards the gate which he had just been repairing, when appellant fired through a window in the side of her house, hitting Horn under the shoulder blade, the ball passing downwards. Horn cried for help, and some men in a nearby tobacco patch hearing his call ran to him. When they reached him, he was near the gate. He said, "The old woman shot me," and sank to the ground. As quickly as they could, these men got him into a machine and took him into town for medical attention, but before they arrived there he had expired. On the other hand, appellant testifies that after Horn had returned the hammer which he had borrowed she went into the house to put it away; that when she got into the room into which the front door of the house opened, she saw Mr. Horn coming up some rough stone steps into the house; that he then made improper proposals to her, and on her repulsing his advances, he continued to approach her, and fearing that he would take by force what he could not get by favor and in defense of her honor and to protect her body from serious harm, she shot him; that he thereupon turned and went out of the house, crossed the stone fence and, went down towards the gate. She at once went to the home of a neighbor, called up the sheriff, and surrendered. There was medical testimony to the effect that considering the nature and character of the wound from which Mr. Horn died, he would

hardly have been able to cross the stone fence after having been shot, although it was possible for him to have done so. The commonwealth endeavored by insinuation to establish that the cause of appellant's shooting Mr. Horn was that Horn had given her husband notice to move out of this shack because of his failure to pay the rent due for it, and that it was because of anger over this action of Mr. Horn that appellant shot and killed him. However, the appellant denied that she knew anything whatever about her husband being behind in the rent or that Mr. Horn had given him any notice to move, and there is not a scintilla of evidence in the record to show that appellant did know that her husband was behind in the rent or that he had been given notice to move, or even that he was in such arrears.

As grounds for reversal, appellant insists that she was entitled to a peremptory instruction; that the commonwealth's attorney was guilty of misconduct; that the court erred in refusing to allow the jury to view the premises; that the court erred in giving and refusing instructions; and that the court erred in refusing to summon a jury panel to try this case from a county other than Mercer county, the county of the homicide.

Addressing ourselves to this last contention, first, we find much said in brief about the condition of the public sentiment in Mercer county over this homicide; about the wide connections of Mr. Horn by blood and marriage and his extensive acquaintance because of public office he had held; much about the humble and obscure condition of appellant. But the record is silent as to all of these matters. In the absence of a showing that the court acted erroneously in refusing to summon a jury from some county other than Mercer, it must be assumed that the action of the court was correct.

Whether a jury should be sent to view the premises rests in the sound discretion of the trial court. Roberts v. Commonwealth, 94 Ky. 499, 22 S. W. 845, 15 Ky. Law Rep. 341; Young v. Commonwealth, 141 Ky. 708, 133 S. W. 791. In the instant case we have been able to follow the proof without much difficulty, and we dare say the jury with the aid of the map used on the trial, but not sent up with this record, intelligently understood the testimony. We cannot say that on the record as brought to us the lower court abused its dis-

cretion in declining to send the jury to view the premises.

Of course, in view of the resume we have given of the evidence, the appellant was not entitled to a peremptory instruction.

This leaves for consideration the contentions as to the misconduct of the commonwealth's attorney and as to the instructions.

As to the misconduct of the commonwealth's attorney the first item complained of on this score is the continued interrogation of the appellant by the commonwealth's attorney as to whether or not she knew her husband was behind in his rent and had been given notice to move. As to this, we cannot say the commonwealth's attorney exceeded proper bounds since he was endeavoring to establish a motive for the slaying. Under the very nature of things he could in all probability not have established this proposition save by admissions wrung from appellant on cross-examination. Hence the vigorous cross-examination along this line was legitimate. As to the second item complained of, the commonwealth's attorney exceeded all bounds of legitimate interrogation when he inquired of appellant if she had not been forced to move from a place owned by a man by the name of Isom, and that when she was forced to move if she had not complained that a gentleman there had made improper advances to her. It may be said in passing that appellant denied this. But the question should never have been asked. Its poisonous and prejudicial character is at once apparent, for the defense of appellant being such as it was, the insinuation contained in the commonwealth's question undoubtedly seriously shook the jury's belief in appellant's story. The idea was, of course, to convey the thought that appellant was accustomed to accuse her landlords of improper conduct when forced to move. The commonwealth's attorney knew his question was improper, for he never undertook to establish by any proof this matter concerning which he inquired of appellant. Further, the commonwealth's attorney acted improperly when he endeavored to make appellant admit that she and her husband had forged some checks which he was holding in his hands as he questioned appellant, and that she had been able to escape prosecution only because of her poverty and her infant children. By no stretch of imagination could proof of this

matter have been competent. The case being as close as it was, the misconduct of the commonwealth's attorney was highly prejudicial and warrants a reversal. In the case of Jones v. Commonwealth, 191 Ky. 485, 231 S. W. 31, 33, one of the grounds relied upon for a reversal of the judgment was the misconduct of the prosecuting attorney. This consisted of highly improper questions asked of a witness on cross-examination, purporting to lay the foundation for an impeachment of her credibility which was never followed up by any attempt to impeach it. In speaking to this point, this court said:

> "This furnishes grounds for the suspicion that the purpose of the question was to damage the credibility of Miss Worley and to weaken her testimony in the minds of the jury by means of this wholly unwarranted 'smoke screen,' under the belief that they would conclude that 'Where there was smoke there must be some fire.' If such was the purpose of counsel, his conduct was, to mildly put it, most highly improper, a fact which we believe will be universally admitted. The chief purpose in the conduct of trials is, or should be, to see that justice, as near as may be, shall prevail. This can never be accomplished by the injection of misleading matters into the record, either directly or indirectly; for the temple of justice has for its sole foundation, and is built upon, truth, and it is upon this alone that all the law of the country, both civil and criminal, is erected. Attorneys are officers of the court and constitute as much a part of its machinery for administering right and justice in the conduct of trials as does his honor upon the bench, and it would certainly be an unheard of proceeding for the latter to engage in an effort to create a false impression upon the minds of that part of the judicial machinery whose duty it is to pass upon the facts. Cases are not wanting where similar conduct of counsel has been held prejudicial, even to the extent of authorizing a reversal of the judgment. L. & N. R. R. Co. v. Payne, 133 Ky. 539, 118 S. W. 352, 19 Ann. Cas. 294; Shields' Adm'r v. Rowland, 151 Ky. 136, 151 S. W. 408, and Baker v. Commonwealth, 184 Ky. 207, 211 S. W. 566."

Since the judgment must be reversed for the reasons stated, it will not be necessary to discuss whether

the instructions on self-defense complained of go far enough or not under the facts and circumstances of this case. Suffice it to say that the instruction on self-defense offered by appellant more adequately covers her theory of this case, and on the next trial the court will give it in lieu of the instruction which the court did give on this issue.

For the reasons herein stated, the judgment is reversed, with instructions to grant the appellant a new trial in conformity with this opinion.