# Wireman v. Commonwealth.

May 22, 1942.

A. H. Patton for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY SIMS, COMMISSIONER—Reversing.

The appellant, Charlie Wireman, was jointly indicted with Bud Wireman and Jim Dunn for the malicious shooting and wounding of Ulysses Reed, a negro. Upon a separate trial he was convicted and his punishment was fixed at confinement in the penitentiary for two

years. On this appeal he assigns four errors: 1. Competent evidence was excluded; 2. the verdict is flagrantly against the evidence; 3. the instructions are erroneous; 4. the jury should have been allowed to view the scene of the shooting.

At the time of the difficulty appellant was a deputy constable and his brother and co-defendant, Bud Wireman, was a deputy sheriff in Breathitt County, and the record does not show that the other defendant, Dunn, was an officer. On the morning of September 7, 1938, appellant arrested Reed on the streets of Jackson for being publicly drunk. While escorting him to jail Reed became obstreperous, struck the officer on the head with his fists, who retaliated with his black-jack to subdue the prisoner. Charlie, and Granville Gross, who assisted him in the arrest, and Stanley Fletcher, the deputy jailer, all testified Reed threatened to kill Charlie after he got out of jail. Reed denies making the threats.

About 1 P. M. on the day of his arrest Reed was released from jail. Late that afternoon upon leaving the bank where he was employed as janitor Reed put a .38 caliber Smith & Wesson pistol in his pocket which belonged to his employer. He went to a liquor store and bought a half pint of whisky. A clerk in the liquor store, Charles Napier, was asked if Reed's nephew, Herman Higgins, said anything to Reed about liquor and the court sustained the Commonwealth's objection thereto. An avowal was made to the effect that Higgins told Reed not to get drunk or he would be put back in jail, and the latter pulled a pistol about half way out of his pocket saying that the same fellows would not do it. This testimony was clearly competent as tending to prove whether or not Reed was drunk or resisted arrest shortly thereafter. We are not reversing the judgment on this account, but because of erroneous instructions as will appear later; however, should there be another trial, the court will admit this testimony.

About dark Reed started home in company with Arnold Turner and Higgins. As the trio passed the court house Turner and Higgins stopped for a drink of water at a well and Reed walked on down Main Street. The three defendants were in a car which they testified was parked on Main Street near the corner of Jail Street and as Reed passed he came up to the side of the car saying with an oath, "Where is the Wireman law, [evident-

ly referring to appellant] I've got a match to set it afire''; that he walked on down the street, took a seat on the curbstone, pulled out his pistol and pointed it at the car. Thereupon the three defendants alighted from the car, Bud taking his position near the center of the street and Charlie and Dunn on the sidewalk. Bud told Reed he was going to arrest him and just as he spoke the words the latter shot him in the arm, and he returned the fire as Reed shot the second time. Charlie and Dunn corroborate Bud, the former testifying that he shot in the defense of his brother, while Dunn said he was unarmed and did not fire. Reed was shot three or four times, fell in the gutter and after he was down handed his pistol to Higgins.

Reed testified the officers' car was not parked, but drove up; that three men got out and Charlie and Bud started shooting without saying a word; that bullets from the pistol of each struck him; he never fired a shot; when he attempted to draw after the shooting started his pistol hung in his pocket; after he fell his nephew came to him and he handed the latter his pistol. Later that night at the hospital when Higgins was requested to show Reed's pistol to E. E. Neff it was found to contain four unfired cartridges and one empty chamber. An examination by J. T. Goff the next day showed oil in the barrel and from this he testified it had not been recently fired. But there was ample opportunity for this pistol to have been cleaned and reloaded while in the possession of Higgins. The morning after the shooting when the officers were trying to locate Reed's pistol, the fact that Higgins stated under oath to the county judge he knew nothing about it suggests that Higgins might have altered the condition of the pistol after it came into his possession.

Bud was shooting a .38 Special, Charlie a .38 Automatic, and Reed's pistol was a .38 Smith & Wesson, each of which shot a different type bullet. Behind Bud and in the direct line of fire of Reed, if he shot at the former, stood the Library building. It was testified there were no bullet holes in the library door the morning before the shooting, but on the morning thereafter there were two fresh bullet holes in the door. A bullet was removed from one of these holes and was found to have been fired by the same character of weapon that Reed had. This physical fact is most convincing evidence that Reed

had fired two shots at Bud as the latter testified. Charlie was shooting at Reed in the opposite direction from the Library and could not have hit this door. Then too, the bullet that was extracted from the door was not fired by the type of pistol Charlie was shooting.

The learned Assistant Attorney General who briefed this case for the Commonwealth admits that the physical facts show it was impossible for anyone but Reed to have fired the two bullets entering the door. His brief indicates that the verdict is flagrantly against the evidence and that the Wireman brothers were acting within the law and were performing an official duty at the time they shot Reed. Conceding that the evidence strongly supports this view, we at this time refrain from so holding because the judgment must be reversed for erroneous instructions. As the evidence may be different on another trial, we expressly reserve the question whether or not the verdict is flagrantly against the evidence.

The self-defense instruction is erroneous and prejudicial since it leaves for the determination of the jury, and not the appellant, whether or not he and his associates were in apparent danger at the hands of Reed. This court has written many times that it is not whether the danger from death or great bodily harm to the accused was apparent to him in the exercise of a reasonable judgment. Two somewhat recent cases so holding are Poe v. Com., 244 Ky. 649, 51 S. W. (2d) 937; Pelfrey v. Com., 255 Ky. 768, 75 S. W. (2d) 510. A clear and concise instruction on self-defense coupled with the defense of another is found in Stanley on Instructions, Section 892.

The instruction authorizing appellant to arrest Reed and to use the necessary force to compel him to submit to arrest was prejudicially erroneous in that it limited appellant *to use such force as was necessary,* when it should have authorized him *to use such force as was necessary, or as appeared to him in the exercise of a reasonable judgment to be necessary* to effect Reed's arrest, even to shooting him. A full discussion of the law on this point is found in Maggard v. Com., 232 Ky. 10, 22 S. W. (2d) 298, which opinion incorporates an instruction dealing with an officer's right to make an arrest and the force he may use in so doing. See, also, Stanley on Instructions, Section 879. Also, this instruction should have permitted Reed's arrest if he were carrying concealed a pistol or pointing or flourishing same, since the

testimony for appellant is that he was committing such offenses as well as being drunk and profane on a public street in the officer's presence.

In addition to the two prejudicial errors, the instructions are ineptly worded and are confusing, and appear to have been hurriedly if not carelessly drawn. The misdemeanor instruction omits the act of shooting, and as such an omission appears in a second copy of the instructions contained in the record, it will be seen it is not the mistake of the copyist. The reasonable doubt instruction is so circuitous and involved that it might be misleading if not read with considerable care. Reference is made to Stanley on Instructions, Section 957, where a more concise instruction on reasonable doubt involving two crimes may be found, and even that may be considerably shortened by the omission of unnecessary verbiage.

In overruling appellant's motion to permit the jury to view the scene of the shooting, the trial judge did not abuse the sound discretion vested in him by Section 236 of the Criminal Code of Practice. Cox v. Com., 251 Ky. 128, 64 S. W. (2d) 481; Morgan v. Com., 257 Ky. 691, 79 S. W. (2d) 1. There is nothing to mark the positions of the combatants on the sidewalk and in the street and without their positions being indicated, a view of the library door would have meant practically nothing to the jury. We have followed the proof without difficulty from a diagram appended to appellant's brief, and the jury with the aid of such a drawing should be able to intelligently understand the testimony.

The judgment is reversed for proceedings consistent with this opinion.