STATE OF HAWAII *v.* LOUIS BENJAMIN CLYDE.

No. 4344.

January 23, 1964.

Tsukiyama, C.J., Cassidy, Wirtz,
Lewis and Mizuha, JJ.

OPINION OF THE COURT BY MIZUHA, J.

Defendant-appellant was convicted of murder in the first degree and as required by R.L.H. 1955, § 291-5 (Supp. 1961), sentenced to life imprisonment not subject to parole.

Defendant and the deceased, Ruperto Canto, had had several altercations prior to the date of the murder. On

December 28, 1961, defendant broke into a friend's apartment and took a twelve gauge shotgun without permission and then drove to Canto's apartment. He walked into the Canto apartment with a jacket covering an object, "shook the jacket off the shotgun," pointed the shotgun at Canto and according to defendant told him "don't move." The victim's wife, Mrs. Bette Canto, screamed. The defendant testified that this scream distracted his attention, that he then caught a glimpse of the deceased leaping towards him and the shotgun went off. The deceased was shot three times. Defendant claimed that he fired in self-defense. According to Mrs. Canto's testimony, when the shotgun was revealed, she asked, "are you going to shoot him" or "are you going to kill him," and defendant said "yes" and almost simultaneously fired.

Defendant specifies as error the trial court's ruling that Mrs. Bette Canto was a competent witness. Defendant based his objection on the ground that the defendant and the witness were husband and wife.

The defendant had been married twice prior to his alleged marriage to Mrs. Canto. Defendant testified that his first marriage was to a Marguerite Johnson sometime during the Second World War. That marriage was validly dissolved. In 1947, while the defendant was a merchant seaman, he married Bessie Lavonia Clyde. After several years of marriage, Bessie Lavonia Clyde informed him, in February 1958, that she had obtained a Mexican divorce in Juarez, Mexico around January or February 1958. The defendant had not been served with any papers. The only evidence as to the validity of this divorce was defendant's testimony based on the information he had received from Bessie Lavonia Clyde.

Mrs. Canto testified that she had first been married to a Mr. Grant whom she claims to have divorced in Juarez, Mexico after she had resided there "a little over

six weeks" prior to her divorce.[1] She further testified that she had a paper showing that she was divorced from Mr. Grant. No document to this effect was produced in court. Subsequent to that divorce, she met the defendant in Los Angeles, California. In May 1958, three months after meeting the defendant, she drove to Tijuana, Mexico with the defendant for the admitted purpose of getting married. That alleged marriage was claimed to have been performed by Mexican proxy procedure.[2]

As to the validity of this marriage, Mrs. Canto testified that she and the defendant went to an office where they were met by a young gentleman. Some papers were signed and they were told that the ceremony would be performed later by proxy.[3] An amount of money was requested from the defendant. Since the defendant did not have the amount necessary, the defendant paid a lesser sum with the understanding that the remainder would be paid upon delivery of certain papers. However, no papers were received and the defendant did not pay the balance. Neither Mrs. Canto and the defendant nor their proxies went through any other marriage ceremony. Defendant testified that he and Bette were informed there would be a ceremony later in Juarez, Mexico, but also were informed that they "are hereby married" on signing the papers.

Mrs. Canto and the defendant lived as husband and wife from the date of the trip to Tijuana. In 1958 they moved to Honolulu, and in 1960, returned to the Mainland. In August of 1961, they once again returned to Hawaii. Mrs. Canto met the deceased while working at

---

[1] See Berke, *Mexican Divorces*, 7 Prac. Law. No. 3, p. 84.

[2] See Stern, *Marriages by Proxy in Mexico*, 19 So. Cal. L. R. 109.

[3] See 2 Cal. Family Lawyer, *Mexican Marriages and Divorces*, § 33; Stern, *Mexican Marriages and Divorces*, 20 Journal of the State Bar of California, No. 2, p. 53.

the Danceland as a taxi-dancer. She and the defendant separated in November 1961. Thereafter on December 11, 1961, without the benefit of a divorce from the alleged Mexican proxy marriage, but upon the advice of counsel, Mrs. Canto married the deceased, Ruperto Canto.

Our statute, with reference to foreign contracted marriages, states:

"* * * Marriages legal in the country where contracted shall be held legal in the courts of the Territory." R.L.H. 1955, § 323-3.

The point at issue is presented by R.L.H. 1955, § 222-18, which states:

"* * * Nothing herein contained shall render any person who in any criminal proceeding is charged with the commission of any indictable offense, or any offense punishable on summary conviction, compellable to give evidence for or against himself; or, except as hereinafter mentioned, shall render any person compellable to answer any question tending to incriminate himself, or shall in any criminal proceeding render any husband competent or compellable to give evidence against his wife, or any wife competent or compellable to give evidence against her husband, except in such cases where such evidence may now be given and in such cases in which the accused is charged with the commission of an offense against the person of his wife or of her husband, as the case may be; provided that in all criminal proceedings the husband or wife of the party accused shall be a competent witness for the defense."

It is a general rule of evidence that "the burden of proving that the marriage relation exists between the proposed witness and another rests on the party opposing the competency of the witness. * * *" 97 C.J.S., *Witnesses*, § 78.

Since R.L.H. 1955, § 323-3 states that a foreign marriage is valid in Hawaii if it is valid where it is contracted, Mrs. Canto would have been incompetent to testify if the proxy marriage were shown to be valid under the laws of Mexico.

In *Territory* v. *Cheong Kwai*, 15 Haw. 280, in a trial for assault with intent to murder, the only witness was a Chinese woman who was claimed to be the wife of the defendant. This court ruled that she was competent to testify.

"* * * The burden was clearly on the defendant to prove that the witness was his wife. * * * Evidence at length was given to show what was essential to constitute a marriage under custom in China. The Judge found that there was a failure to show a compliance with the essentials of marriage under this custom and that a marriage had not be proved and that the witness was competent." *Territory* v. *Cheong Kwai, supra* at 282.

See *Lynch* v. *State*, 5 Ohio App. 16; *People* v. *Zabijak*, 285 Mich. 164, 280 N.W. 149; *Commonwealth* v. *Clanton*, 395 Pa. 521, 151 A.2d 88; *Krzesinski* v. *State*, 333 S.W.2d 149 (Tex. Cr. App.). *Cf., Lutwak* v. *United States*, 344 U.S. 604, 73 S. Ct. 481, 97 L. Ed. 593; *rehearing denied* 345 U.S. 919, 73 S. Ct. 726, 97 L. Ed. 1352; *Territory* v. *Rutherford*, 41 Haw. 554.

"When powers of attorney for the conclusion of a marriage in the absence of the parties are executed in places such as Tijuana, the marriage is concluded neither as an immediate consequence of the execution of the powers of attorney nor at the place of this execution. This point requires emphasis, as North Americans frequently understand, or are given the impression by marriage agents, that a marriage has been performed or that all steps for the conclusion of a marriage except 'record-

ing' have taken place. Many marriage agents employ ceremonious wording and issue 'marriage recording receipts' which actually are receipts for money paid and a promise that a 'recording' of the marriage will take place in a remote state. There is no marriage or semblance of a marriage until the marriage has been performed by proxy (usually in a remote place far from Tijuana)." 2 Cal. Family Lawyer, *Mexican Marriages and Divorces,* § 33.12.

No marriage certificate or any other documentary evidence of the performance of the proxy marriage ceremony was introduced by the defendant.[4] Neither California nor Hawaii recognizes common law marriage, so the fact that defendant and the witness lived together as husband and wife is immaterial, or if that created a presumption, the other evidence has dispelled the presumption. The trial court did not err in ruling that the marriage between Mrs. Canto and the defendant had not been proved and that the witness was competent. It is unnecessary to go into the question whether defendant and the witness were free to marry.

Defendant's next contention is that the trial court erred in refusing to strike from the record evidence of the deceased's reputation for peace and quiet.

There were three rebuttal witnesses produced by the State who testified that the reputation of the deceased for peace and quiet was good. On cross-examination, counsel for defendant brought out the fact that two of the three witnesses had never heard the reputation of the deceased discussed. The basis of the motions to strike was that the witnesses had not heard anything from others about the deceased's reputation, and therefore no sufficient foundation was laid. The third witness testified that she had discussed the reputation of the deceased with others, but

---

4 See 2 Cal. Family Lawyer, *Mexican Marriages and Divorces,* §§ 33.9, 33.15.

the defendant argues that the witness did all the talking, and had not heard others discuss the reputation of the deceased.

Each of the witnesses, however, was in a position to know the general reputation of the deceased in the community. Each testified that he or she did know it. One of the witnesses testified that he had never heard anything bad said about the deceased. Another witness testified that she had not heard anything bad about the deceased nor anything about his getting into trouble. The third witness testified that she had many discussions with her neighbors about the reputation of the deceased and that it was the best.[5] In a case very similar to the instant case the Supreme Court of California stated:

"The greater stress, however, is laid upon the ruling admitting the negative testimony of witnesses as to the reputation of the deceased for peace and quiet, and in refusing to strike out this evidence when it was shown that the witnesses in question had not heard the reputation of the deceased for the particular traits in question discussed. But it is a matter of common sense, common observation, and common knowledge that a man's reputation for peace and quiet is seldom a matter of discussion until some alleged breach of the law calls up its consideration. Thus in *Regina* v. *Cory*, 10 Cox C.C. 23, Chief Justice Cockburn remarks: 'I am ready to admit that negative evidence to which I have referred, of a man's saying "I never heard anything against the character of the person of whose

---

[5] "Q  [By defense counsel]  And these neighbors at the most would be not more than three, would they?
"A  There are more than three.
"Q  More, all neighbors?
"A  Yes.  There were some right around the neighborhood that I talked about my brother, too.
"Q  In other words, you would talk to them about him about what a wonderful brother he is?
"A  Yes, we would discuss things like that."

character I came to speak on," should not be excluded. I think the fact it is given in the negative form is the most cogent evidence of a man's good character and reputation, because a man's character does not get talked about until there is some fault to be found with him. It is the best evidence of his character that he is not talked about at all. I think the evidence is admissible * * *.' " *People* v. *Adams,* 137 Cal. 580, 580-81, 70 Pac. 662, 663.

See *Leonard* v. *State,* 17 Ariz. 293, 151 Pac. 947; I Wharton, *Criminal Evidence,* § 228 at 479 (12th ed.).

Rebuttal evidence as to the character and reputation is not limited to affirmative evidence, *e.g.,* "I have only heard the person discussed in the most respectful terms," but can also take the form of negative evidence, *e.g.,* "I have not heard anything said to the detriment of the good character of the person." That the evidence is in the negative form will not bar its admissibility.[6]

In this case, two of the witnesses testified they had not in fact heard Canto discussed. They testified later that they had heard nothing adverse to Canto's reputation. The negative nature of this testimony would go to the weight of the evidence and not its admissibility. See *People* v. *Adams, supra; Leonard* v. *State, supra; State* v. *Axelson,* 37 Wash. 2d 393, 223 P.2d 1059. The remaining witness had in fact discussed the reputation of the deceased with her neighbors and there is nothing in the record showing testimony to the effect that she had not heard anything about the reputation of the deceased as claimed by the defense. The trial court did not err in refusing to strike the testimony.

Defendant contends also that the court erred in failing to grant his motion to strike the testimony of witness David Kalauokalani. Again, the basis of that motion was

[6] Annot., 34 A.L.R.2d 451, 480, § 17.

that no sufficient foundation had been laid. Upon the denial of that motion to strike, defendant moved for a mistrial, which was similarly denied.

The witness, aged 14, was first found to be a fully competent witness by the court. By his testimony, the State offered to prove that the defendant had telephoned the witness' home, asked to speak to "Bette," and when told that Mrs. Canto was out, and that the witness' mother for whom the caller then asked was busy, threatened to blast the witness' family off the face of the earth. On cross-examination, appellant showed that the witness had in fact only heard defendant's voice twice, and only while defendant was passing him on the premises.

"The content or words spoken in a telephone conversation are admissible if the identity of the person with whom the witness was speaking is satisfactorily established. * * *

"It is generally held that a person may be recognized and identified by his voice if the witness is acquainted with it. * * *" 2 Wharton, *Criminal Evidence*, § 696, p. 685-86 (12th ed.).

See *State* v. *Usher*, 136 Iowa 606, 111 N.W. 811; *State* v. *McGee*, 336 Mo. 1082, 83 S.W.2d 98.

Here, to the satisfaction of the trial court, the witness satisfactorily identified the voice. See *State* v. *Dillingham*, 134 N.J.L. 229, 46 A.2d 813; *Merritt* v. *United States*, 264 Fed. 870, *rev'd on other grounds*, 255 U.S. 579, 41 S. Ct. 375, 65 L. Ed. 795. Compare *People* v. *Thompson*, 231 Mich. 256, 203 N.W. 863.

"The qualification of the witness to express an opinion as to the identity of the voice must be shown as based either on familiarity with the speaker, or upon some pecularity in the voice which would make it likely that the witness could distinguish and identify the voice in question. The previous acquaintance required

to render such testimony relevant varies from hearing the voice but once, to that knowledge of it which is derived from an intimate acquaintance with the accused." 1 Wharton, *Criminal Evidence,* § 183, p. 365 (12th ed.).

That on cross-examination the witness was shown to have only heard the defendant speak twice, and only "hello" does not make the evidence inadmissible. The facts brought out on cross-examination would go to the weight of the evidence rather than its admissibility.[7] 1 Wharton, *Criminal Evidence,* § 183 (12th ed.). No error is shown by this assignment.

Appellant contends next that the court erred in giving the instruction on self-defense. Instruction 37 read:

"The acts which a person may do in self-defense and justify under a plea of self-defense depend upon the conduct of those involved in the encounter and the circumstances attending it. No fixed rule is applicable to every case, but certain general principles are established as guides for the jury's determination.

"The law of self-defense is founded on the principle of necessity, either actual or apparent, and in order to justify the taking of human life on this ground the slayer, as a reasonable man, must have reason to believe and must believe that he is in danger of receiving great bodily harm; and further, the circumstances must be such that an ordinarily reasonable person, if he were in those circumstances and if he knew and saw what such person in real or apparent danger knows and sees, would believe that it was necessary for him to use, in his defense and to avoid great bodily injury

[7] The State also called the witness' mother, who testified that she was called to the phone by her son and in her conversation with the caller, chided him for threatening her son, whereupon he apologized. She was well-acquainted with the defendant and positively identified the voice of the caller as that of the defendant. Her testimony was such as to show that the caller was the same one who spoke to her son.

to himself, such force or means as might cause the death of his adversary.

"A bare fear that a person's life or limb is in danger is not sufficient to justify a homicide. To justify taking the life of another in self-defense, the cirumstances must be such as to excite the fears of a reasonable man placed in a similar position, and the party killing must act under the influence of such fears alone. The danger must be apparent and must be present and imminent, or must so appear at the time to the slayer as a reasonable man, and the killing must be done under a well-founded belief that it is necessary to save one's self from death or great bodily harm."

The trial court did not err. "* * * It is generally held that the apprehension of danger and belief of necessity which will justify killing in self-defense must be a reasonable apprehension and belief, such as a reasonable man would, under the circumstances, have entertained. * * *" 1 Wharton, *Criminal Law and Procedure,* § 215, p. 471. *Addington* v. *United States,* 165 U.S. 184, 17 S. Ct. 288, 41 L. Ed. 679; *Pinder* v. *State,* 27 Fla. 370, 8 So. 837; *Adams* v. *State,* 62 Okla. Crim. 167, 70 P.2d 821; *State* v. *Chesher,* 22 N.M. 319, 161 Pac. 1108; *State* v. *Comisford,* 41 Nev. 175, 168 Pac. 287. "* * * Accordingly, a sincere belief in the imminence of danger does not entitle a person to kill if in fact the belief is not reasonable." 1 Wharton, *Criminal Law and Procedure,* § 215, p. 471-72. *Acers* v. *United States,* 164 U.S. 388, 17 S. Ct. 91, 41 L. Ed. 481; *Pinder* v. *State, supra; People* v. *Ranson,* 119 Cal. App. 2d 380, 259 P.2d 910; *People* v. *Stapleton,* 300 Ill. 471, 133 N.E. 224. Likewise, "the question is not whether the jury believed the force used was necessary in self-defense, but whether the defendant, acting as a reasonable man, had this belief. * * *" Perkins, *Criminal Law,* c. 10, § 4, p. 884. *People* v. *Miller,* 403 Ill. 561, 87 N.E.2d 649; *Wireman* v.

*Commonwealth,* 290 Ky. 704, 162 S.W.2d 557.

The instruction given in the present case, while not stated in the same words, expressed the same rule of law given in the instruction on self-defense in *Territory* v. *Leong Kun,* 29 Haw. 90.

Appellant argues that *Territory* v. *Yadao,* 35 Haw. 198 is controlling in this jurisdiction on the law of self-defense. In that case, the defendant was indicted and tried for assault and battery with a weapon obviously and imminently dangerous to life. At the time of the incident, the prosecuting witness was armed with a club. The defendant, seeing the prosecuting witness make a "fencing sign"—the traditional "en garde"—shot at the prosecuting witness. On cross-examination of the prosecuting witness, the defendant tried to press questions about the details of the "fencing sign." The trial judge sustained the prosecution's objections to these questions. On appeal, defendant specified as error the trial court's ruling on these questions. This court concluded that the trial court had erred in restricting the scope of defendant's right of cross-examination by not allowing the questions about the "fencing sign."

In *Territory* v. *Yadao, supra* at 201-02, this court stated:

> "The defendant in the exercise of his right of self-defense was not limited to the absolute necessity of the occasion but only by what reasonably appeared to him to be dangerous at the time, viewed from his standpoint. (5 C.J., tit. Assault and Battery § 235, p. 747.[8])

---

[8] It should be noted that the statement quoted from 5 C.J., § 235, p. 747 (1916 ed.) in the *Yadao* case, *supra,* was revised in 6 C.J.S., § 92, p. 944 (1937 ed.) to read as follows:

"His right of self-defense is not limited, however, to the absolute necessity of the occasion, but only by what reasonably appears to him to be dangerous at the time, *and the apparent danger must be measured by the judgment which would have been exercised by a reasonable man.* * * *" (Emphasis added.)

And he was entitled to act on the apparent danger as it reasonably appeared to him at the time. * * * "

Relying on the aforesaid statement on self-defense, defendant in this case requested the following instruction (Defendant's Instruction No. 1):

"If you find from all the evidence, including defendant's mental condition and his prior mental history, that at the time defendant obtained the weapon and proceeded to the room of the deceased, defendant was acting upon an apparent danger as it reasonably appeared to him at that time, in that he believed his life was in danger and that when he fired the weapon he felt it was necessary to protect himself from defendant [*sic*] then you are instructed defendant acted in self defense and you must return a verdict of not guilty."

This instruction attempts to set forth a subjective test for the law of self-defense. The statement on self-defense in the *Yadao* case, *supra,* was made with reference to the permissible scope of cross-examination when the issue of self-defense is raised by the defendant. The instruction on self-defense was not under review. Although not quoted in the opinion, inasmuch as it rested on the undue restriction of cross-examination, the instruction on self-defense, which was not argued as error, was similar to the instruction given in *Territory* v. *Leong Kun, supra,* and repeated in *Territory* v. *Aquino,* 43 Haw. 347, 354 P.2d 966.

"* * * It is not every statement of the law found in a text-book or opinion of a judge, however well and accurately put, which can properly be embodied in an instruction. * * *" *Garfield* v. *State,* 74 Ind. 60, 63, quoted in *Territory* v. *Cutad,* 37 Haw. 182, 186, and *State* v. *Evans,* 45 Haw. 622, 636, 372 P.2d 365, 374. Moreover, nothing said in the *Yadao* case goes as far as the requested instruction which uses the words "in that he believed his life was

in danger." We rejected the subjective test in *Territory* v. *Aquino, supra* at 379, where this court approved the following instruction:

"'I further instruct you that self-defense, in proper cases, is the right of every person. It may be resorted to by anyone who is violently assaulted by another in such a manner as to cause the person so assaulted in good faith to believe that he is in immediate danger of either being killed or of receiving great bodily harm from his assailant, however, it must appear that the circumstances were sufficient to excite the fear of a reasonable person similarly situated and that this defendant was acting in good faith during the situation and circumstances from his standpoint and that he really acted upon the influence of such a fear and not in the spirit of ill-will, hatred or revenge.

"'\* \* \* Circumstances justifying assault in the law of self-defense must be such as to render it unavoidable under all the circumstances, judged from the standpoint of a reasonable man placed in defendant's position, and if you believe from the evidence that this defendant could have avoided any conflict between himself and the deceased without increased danger to himself, it was his duty to avoid such conflict and so render his resort to the law of self-defense unnecessary.'"

Defendant further claims that the trial court erred in refusing his instruction No. 1 on the ground that it failed to submit to the jury on the issue of self-defense, the question of defendant's mental condition and his prior mental history. This contention is without merit. Instructions covering insanity were given and it is not claimed by the defendant that they were inadequate or erroneous. In rejecting a similar instruction which would have resulted in applying a purely subjective test, the California Appel-

late Court in *People* v. *Spraic,* 87 Cal. App. 724, 728, 262 Pac. 795, 797-98, stated:

"* * * This instruction mingles the doctrines relating to insanity and self-defense, and declares, in substance, that one may justify a homicide as in self-defense on such a view of the circumstances as would be taken by a man without reason, whereas the true rule is that one who attempts to shield himself behind the doctrine of apparent necessity can do so only if the necessity would have been apparent to a reasonable man under all the circumstances of the case as known to the slayer. * * *"

Appellant further contends that the court erred in giving instructions 38 and 39. Instruction 38 read:

"The right of self-defense is not available to a person who has sought a quarrel with the design to force a deadly issue and thus through fraud, contrivance or fault, to create a real or apparent necessity for making a felonious assault."

Instruction 39 read:

"When one makes a felonious assault upon another person, or has created appearances justifying that other person in making a deadly counter attack in self-defense, the one making the felonious assault may not kill the other person and then avail himself of the plea of self-defense unless, before the killing, he first and in good faith declines further combat, honestly endeavors to desist therefrom, fairly notifies the other person that he has abandonned the contest, and then is confronted by conditions justifying the killing."

These instructions are the necessary corollary to the instruction of self-defense. See *Territory* v. *Leong Kun, supra; Territory* v. *Aquino, supra.*

Here, the testimony shows that there had been several incidents between the defendant and the deceased. There

is testimony to show that at one meeting between the defendant and the deceased, the defendant chased the deceased. The testimony shows that another time the defendant threatened that "he was going to fix him [Canto]." A third occasion occurred in which the defendant was seen walking towards the deceased with a tire iron. Also, on the date of the killing, the defendant admitted breaking into a friend's apartment to obtain the twelve gauge shotgun, with which the deceased was shot. The manner in which he entered the Canto apartment and brandished the gun has been reviewed earlier in this opinion. Under these circumstances, the instructions were proper. See *State* v. *McCaskill*, 160 Iowa 554, 142 N.W. 445; *Macias* v. *State*, 39 Ariz. 303, 6 P.2d 423; *State* v. *Schroeder*, 103 Kan. 770, 176 Pac. 659.

The judgment is affirmed.

*Myer C. Symonds* and *William Kim* for defendant-appellant.

*Herbert T. Tanigawa*, Deputy Prosecuting Attorney, City and County of Honolulu (*John H. Peters*, Prosecuting Attorney), for plaintiff-appellee.