TERRITORY OF HAWAII *v.* POLICARPIO AQUINO.

No. 4035.

Argued October 1, 1958.                    Decided July 2, 1959.

Rice, C. J., Stainback and Marumoto, JJ.

348

OPINION OF THE COURT BY RICE, C. J.

This case is before the court by writ of error to the circuit court, first circuit, Territory of Hawaii, the Honorable Frank A. McKinley, presiding.

Defendant-plaintiff in error, Policarpio Aquino, hereinafter referred to as the defendant, was indicted for the crime of manslaughter (violation of Section 11396, Revised Laws of Hawaii 1945, now Section 291-7, Revised Laws of Hawaii 1955) on August 18, 1955. He was charged with, on February 5, 1955, having unlawfully, etc., without malice aforethought and without authority, justification and extenuation by law, struck, stabbed and cut one Sabas Agcaoili with a knife, thus giving him certain wounds from which on the same day Agcaoili did die.

The defendant, having entered a plea of "not guilty," went to trial before a jury in the circuit court and on the sixth day of trial was found guilty as charged. He was thereafter sentenced to ten years in Oahu Prison.

As early as the examination of jurors on voir dire, the defendant had indicated that he would defend on the ground of self defense.

At the conclusion of the case in chief for the prosecution and after the prosecution had rested, on March 14, 1957, counsel for the defendant moved for a directed verdict, alleging that there was not evidence sufficient to warrant a conviction and that proof beyond a reasonable doubt did not attach at that time. The motion

for directed verdict was denied. Thereafter the defendant took the stand and testified on his own behalf. Two other witnesses were called and examined on behalf of the defendant. The defense then rested and, there being no rebuttal, again moved for a directed verdict of acquittal, which was denied.

There are seven assignments of error, which are in substance that the circuit court:

(1) Erred in refusing to charge the jury as requested in defendant's requested instruction number 8, in that such instruction was a proper statement of the law of self-defense as adopted by this court;

(2) Erred in charging the jury as requested by the Territory of Hawaii in its requested instruction number 14 and in refusing to charge the jury as requested in defendant's instruction number 10, in that the latter constituted a portion of the language contained in Territory's instruction number 14, but none of the incorrect and improper language of said number 14;

(3) Erred in charging the jury as requested by the Territory of Hawaii in its requested instruction number 15B, in that it did not correctly or properly state the law of self-defense as laid down by this court, was ambiguous and misleading, and served to confuse the jury;

(4) Erred in refusing to charge the jury as requested in defendant's requested instruction number 1, to the effect that the jury should find the defendant not guilty, which instruction embodied the substance of defendant's motion for a directed verdict of acquittal, made at the conclusion of all the evidence submitted in the case and which was denied;

(5) Erred in refusing to grant defendant's motion for a directed verdict of acquittal made at the conclusion of the Territory's case;

(6) Erred in refusing to permit defendant to introduce evidence of the actual character and reputation of the deceased (for whose death he was being tried) "as a person of violent and turbulent nature; more specifically, but not exclusively," the court's refusal of evidence as to the police record of deceased and the court's rejection of defendant's offer of proof as to the aforesaid;

(7) Erred in admitting into evidence the written and signed statement of defendant obtained by the police. (Exhibit "O") and

all other testimony relating to statements, admissions and the alleged confession of defendant obtained from defendant more than 48 hours after his arrest and his first having been placed in police custody, "and while he was illegally detained" and in violation of the so-called "48-hour law" (Section 10709, R. L. H. 1945, as amended, Section 255-9, R. L. H. 1955) "and in violation of the due process of law clauses of both the Fifth and Fourteenth Amendments to the Constitution of the United States; * * *."

The defendant's version of the facts, as given in the "Statement of the Case" in the "Opening Brief of Plaintiff in Error" is as hereinafter quoted.

"The locale of the offense charged was a rooming and tenement area at Corkscrew Lane, just off Fort and Kukui Streets in downtown Honolulu. Defendant had previously lived there and knew the residents of the area. He frequently returned to visit. One late Saturday afternoon he visited the area and ended up in an apartment with some friends, drinking beer and watching television. A few hours later the group dispersed. Outside, in the alleyway between buildings and near Corkscrew Lane defendant and Agcaoili met and had words. Agcaoili lived in the area, but further down toward Corkscrew Lane from where defendant had been, or where they met. Defendant stated Agcaoili had been at the apartment drinking, at least part of the time. Government witnesses placed him there earlier but were vague as to whether he had been there later.

"Defendant and Agcaoili got into a fight. Defendant said Agcaoili first grabbed and struck him with his hands, they wrestled about on the ground, defendant bested Agcaoili who then broke off the encounter and ran off to his (Agcaoili's) room. He returned with a knife in his upraised right hand and rushed at defendant, who in turn raised his left hand and had his left palm slashed open; defendant, however, was able to cling to Agcaoili's knife hand with both his cut left hand and his right hand. They then wrestled again, this time for possession of the knife, and again rolled upon the ground. Defendant was able to seize the knife and stabbed Agcaoili with it. The foregoing is substantially the testimony of defendant and is substantially unrebutted.

"One Enfiel testified as a prosecution witness that he was called to the scene of the fight by his son; that it was dark; that he made out two figures, defendant and Agcaoili, struggling with each other on the ground; that defendant appeared to be on top; that Enfiel tried to stop the fight by pushing Aquino aside and he (Enfiel) got cut on the shoulder so he ran off. He said it was dark, that he at no time saw any knife and that he didn't know who cut him. Defendant, on the other hand, contended that Enfiel came up after the fight was about over and as defendant was pulling himself upright, and Enfiel struck him on the head with a piece of pipe; defendant thereupon grabbed the pipe with one hand as Enfiel attempted a second blow and struck out with his other hand in which was the knife he had just taken away from Agcaoili. Enfiel released the pipe and ran off.

"In any case, defendant had been wounded, was bleeding and had suffered a blow to the head; in this condition he walked down Corkscrew Lane to Fort Street and thence to River Street where he lived, holding the knife in his hand. A short time later he was apprehended by a police officer at his residence, taken into custody, taken to the Emergency Hospital for treatment of his wounds and then (still in custody) lodged in the Queen's Hospital for the next five days.

"While in the hospital he was interrogated by the police on different occasions; when he left the hospital February 10 he was taken to police headquarters, further interrogated, a written statement was obtained and he was finally charged, then released on bond."

However, the following, gleaned from the transcript of evidence, which is part of the record in this case, discloses much more than has been set forth in the defendant's version of the facts as above quoted.

When a witness for the prosecution, Quilas Enfiel, testified in substance that when he first saw the defendant and Agcaoili, hereinafter referred to as Sabas, fighting, the defendant was on top; that he, Enfiel, wanted to stop the fight, grabbed defendant and pushed him to one side; that he, Enfiel, did not see any knife, but

was cut, so he ran away to call the police. His only purpose when he saw them fighting was to separate them and he did not see a pipe or any other type of instrument used against Aquino and all he used were his hands.

Benedict Eleniki, an officer of the Honolulu Police Department, testified that he arrested the defendant, pursuant to information he had obtained at the scene of the fight and that at the time of arrest the defendant told him, Eleniki, that he, the defendant, had been in a fight somewhere on Fort Street, near Kukui, and several fellows kicked him in the head, which is how he got a bump on his forehead. Officer Eleniki also testified that at the time of arrest, the defendant had an alcoholic breath but was not drunk. The defendant was taken to the scene of the fight at 1281 Fort Street, there identified by two persons, and then because of a cut he had in his left palm was taken to the Emergency Hospital for treatment.

Dr. Alvin V. Majoska, who made a post-mortem examination of Sabas testified that the death of the latter was "determined to be hemorrhage due to a trans-section of the left internal jugular vein, or in lay terms, the large blood vessel of the neck was cut by some cutting instrument. There were four stab wounds on the body, and one of these cut this large blood vessel. In addition to the stab wounds there [were] numerous superficial abrasions and lacerations, or scrapes and cuts." He also testified in substance that a blood alcoholic determination was made and showed concentration of 2 milligrams of alcohol per cubic centimeter of blood, and that a man with 1.5 centimeters of alcohol in his blood would be presumed drunk under territorial statute relative to drunk driving. He also testified that Sabas had weighed approximately 110 pounds and measured approximately 64 inches in height.

Donald Ho, a detective of the Honolulu Police Department testified that at 10:45 A.M. on February 6, 1955, in the presence of a nurse, he questioned the defendant in a cubicle on the second floor in the Queen's Hospital. The jury was excused from the courtroom in the absence of the jury, preliminary examination was made to determine the voluntariness of any statement made to the witness by the defendant, at the conclusion of which the court expressed the finding that the admissions, of the defendant, such as

they were, were elicited under voluntary circumstances, not under duress. Thereafter, in the presence of the jury the witness, Ho, testified that he had asked the defendant about the incident at Fort Street and was told by defendant that three unknown persons had jumped the latter and had beat him for some unknown reason. He had never seen them before and it would be impossible for him to identify any one of them. Detective Ho said he then asked the defendant if the latter had been involved in a fight with a knife and the defendant said no, he was not involved in any fight with a knife.

Asked what was the attitude of the defendant towards his questions, Detective Ho replied:

"A  Well, at that time he was evasive, I wouldn't say arrogant, but he was trying to evade everything the way I was asking him, therefore in my report I made an official request that a Filipino detective be assigned to interrogate him so that he would be able to understand the accused's statement a lot more than I would. In conversing with the accused I did so using Pidgin English."

Upon cross-examination of Detective Ho, the following ensued:

"Q  You say you conversed in Pidgin English?
"A  Yes, sir.
"Q  Would you say that this man had a very fluent way of speaking in Pidgin English so you had no difficulty whatsoever in understanding him?
"A  That is correct."

Mrs. Caroline Travis, a witness for the prosecution, testified that she saw the struggle between Sabas and the defendant and noted that when it ceased, before the policeman or "anybody" arrived the defendant stood up and ran towards Fort Street.

"Q  Did he run or walk?
"A  He run towards Fort Street."

While the defendant was in the hospital he was twice interviewed by Detective Segundo Antonio, once at about 12:15 A.M. of February 6 and again on the following morning, February 7, 1955.

Released by the hospital, but under police guard, the defendant was taken to the detective bureau at about 9:30 o'clock in the morning of February 10, 1955, and was then and there interviewed by Detective Gunderson, with Detective Antonio present. After that morning interview, the defendant went with Detectives Gunderson and Antonio to the scene of his fight with Sabas and there showed the detectives what they wanted him to. Thereafter, the defendant, accompanied by the two detectives, was given an opportunity to go to his room and there changed his clothes, as he had been wearing hospital clothes when released from the hospital.

After the defendant had changed his clothes, he returned with the two detectives to the detective bureau. Defendant was again, at about 1:10 P.M. of the same day (February 10), interviewed by Detective Gunderson, with Detective Antonio acting as interpreter. At about ten minutes later a statement by the defendant was recorded by a clerk-stenographer. (Subsequently, at the trial, a transcript of the statement was marked and will hereinafter be referred to as Prosecution's Exhibit "O" for Identification.)

After the taking and stenographic recording of the statement of the defendant, he was returned to the cell block. On the following day, February 11, 1955, at about 1:00 P.M. the defendant was formally charged with murder in the second degree. He was then released on bond.

While Detective Gunderson was on the stand as a witness and after he had testified as to arriving at 1281 Fort Street inside Corkscrew Lane at about 10:50 P.M. of February 5, 1955, and what he did, observed and learned in the course of investigation, the taking of measurements and the making of a fruitless search for a weapon and thereafter going to the City and County Morgue and checking the body of the deceased (Sabas) for wounds, the prosecutor made a statement to the court to the effect that he (the prosecutor, Mr. Yamane) would like to go into the voluntariness of the statement made by the defendant. Whereupon the jury was excused and out of the presence of the jury direct and cross-examination of the witness Gunderson was had with respect to the voluntariness of any statement, or statements, made by the defendant to the witness

Gunderson in the morning and in the afternoon of February 10, 1955.

In the course of his cross-examination, Detective Gunderson testified to the effect that he had not spoken to the defendant at any time prior to the morning of February 10, 1955, but that he did speak to him thereafter at 1:10 P.M. in the afternoon of the 10th and that he charged the defendant at 1:00 P.M. on February 11.

Responsive to questioning, on cross-examination, Detective Gunderson further testified that so far as he could recall the defendant, when he spoke to him, never asked at any time when he could be released; that most of his questioning of the defendant took place through an interpreter, who was Detective Antonio, both in the morning and afternoon sessions; that defendant understands English and can speak a little English, but Detective Antonio was used most of the time.

Thereafter, the witness, Gunderson, was asked by defense counsel this question: "* * * you realize that it is contrary to the law of the Territory, in fact a criminal offense, to hold a man in custody more than 48 hours?" To that question the prosecutor objected, because of evidence of hospitalization of defendant.

The court referred to Act 185, Session Laws of 1953 (now Section 255-9, Revised Laws of Hawaii 1955) and quoted therefrom the provision thereof to the effect that it shall be unlawful "to fail within forty-eight hours of the arrest of a person on suspicion of having committed a crime either to release or to charge such arrested person with a crime and take him before a qualified magistrate for examination."

Referring to the quotation from the statute, the prosecutor contended that it applies to a healthy person who can walk around, who has no injuries to his person; that in this case the defendant was injured, was hospitalized at the Queen's Hospital and that he was charged as soon as released from the hospital.

The trial court held: "That is an obvious condition on the inapplicability of this provision, and that will be my ruling on it."

To which ruling counsel for the defendant asked and was allowed an exception. Ruling accordingly, the court sustained the objection to the question put to the witness Gunderson and to such

ruling counsel for the defendant asked and was allowed an exception.

The court having expressed a feeling of being a bit confused as to what the defendant was arrested for on the night of February 5 and being told by the witness Gunderson that he had not arrested the man, counsel for the prosecution said that defendant was arrested under suspicion of murder and was subsequently on the 11th of February charged with murder in the second degree.

The court then stated:

"Mr. King [counsel for the defendant], I think in reconsidering this matter I will take this position, that when the jury returns you may question the witness with respect to the rights of the arrested person pursuant to section 10709, to see whether or not those have been violated. I will find that statements made during this interview with the witness and the accused in the Interrogation Room No. 1 from and after 9:30 a.m., on the day of February 10th, 1955, were made under circumstances which would indicate that such statements were made in a voluntary manner."

To which statement counsel for the defendant noted and was allowed an exception.

Thereafter the witness Gunderson related in detail a statement which he said the defendant had made to him.

At the conclusion of the recital of the witness Gunderson, the court asked counsel for the defendant whether he wanted to have any cross-examination at that time or wait until the jury returned. To which question the defendant's counsel replied, "I have no questions at this time, * * *."

After a recess, the jury was recalled and the direct examination of the witness Gunderson was resumed in the presence of the jury.

Responsive to questioning, Detective Gunderson testified that prior to his questioning of the defendant in the presence of Detective Antonio neither he, nor anyone in his presence, struck or beat the defendant or offered him any immunity or reward to cause him to talk and that as far as he, Gunderson, was concerned the statements were made voluntarily to him.

Counsel for the defendant having indicated that he had no questions at that time, the court ruled as hereinafter quoted:

"THE COURT: Very well. I will make a finding that such statements as were elicited by the witness from the defendant on the morning of February 10th, 1955, from and after 9:30 a.m. in Interrogation Room No. 1 at the Police Station where [were] all of a voluntary character on the part of the defendant."

To which ruling the counsel for the defendant asked and was allowed an exception, "based on the grounds previously stated."

Thereafter, pursuant to questioning, Detective Gunderson again recited what he had been told by the defendant.

Subsequent to his recital of what he had been told by the defendant in the morning interview, Detective Gunderson was queried as to his interview with the defendant at 1:10 P.M. of the same day and similar questions and answers were put to and received from him as were put to and received from him with respect to the voluntariness of defendant's statements to him during the morning interview.

The following then ensued:

"THE COURT: I will make a finding that such statements as were elicited from the defendant by this witness at 1:10 p.m., on the day of February 10th, 1955, were of a voluntary character and not under duress.

"MR. KING: And my exception, your Honor.

"THE COURT: Very well.

      * * *

"Q   Detective Gunderson, I show you Prosecution's Exhibit 'M' in evidence, can you identify this knife?

"A   It appears to be the same knife.

"Q   That you showed to Aquino that afternoon?

"A   Yes, sir.

"Q   And this was the knife he said he took away from Sabas and that he used against Sabas?

"A   Yes.

"Q   At that time did you take any stenographic statement from him?

"A   I did, at 1:20 p.m.

"Q   Who was present when the stenographic statement was taken?

"A   Myself, Aquino, Clerk Kadota and Detective Antonio.

"MR. YAMANE: (Handing a document to the Clerk) "Will you mark this Prosecution's Exhibit 'O' for identification? "THE COURT: It may be so marked.

"(Whereupon the document which was handed to the Clerk was marked PROSECUTION'S EXHIBIT 'O' FOR IDENTIFICATION.)

"Q   I show you Prosecution's Exhibit 'O' for Identification and ask you whether you recognize this document?

"A   I do.

"Q   What is the document?

"A   It is a stenographic statement which I acquired from Mr. Aquino."

Responsive to questioning, Detective Gunderson then testified, in substance, that neither he, nor anyone in his presence, beat or struck the defendant, or offered him any immunity or reward to make the statement and that it was voluntary on the part of the defendant. He also testified that the questions and answers in the stenographic statement were practically the same as the questions to and answers given by the defendant when the latter was first questioned at 9:30 A.M. of the morning of the same day (February 10); also that the questioning and answering was done through Detective Antonio, acting as interpreter.

Asked whether he had any question with respect to the statement, counsel for the defense said he had none, "except to preserve an exception on the grounds previously stated."

. Counsel for the prosecution asked leave to introduce the exhibit ("O") in evidence at a later time, when Detective Segundo Antonio would testify with respect thereto.

"THE COURT: Very well.

"MR. KING: And might I say, your Honor, with respect to the stenographer who was supposed to have taken the shorthand notes and typed up those notes, I will stipulate that that was all done properly and correctly.

"THE COURT: All right."

Detective Segundo Antonio, of the Honolulu Police Department, as a witness for the prosecution, testified that on February 5, 1955, he was assigned to investigate an incident at Corkscrew Lane and went there about 11:25 P.M.; that he there saw the body of a man lying on his back with the head toward the Ewa direction, that is towards Fort Street; that in view of his instructions, he, Detective Antonio, contacted Detective Gunderson at the scene. They took accurate measurements at the scene, between 11:30 P.M. and 12:00 midnight. Thereafter he, Detective Antonio, returned to the detective bureau and was there instructed to go to the Queen's Emergency and interview Policarpio Aquino, whom in the courtroom he identified as the defendant herein.

Detective Antonio further testified, in substance, that he did question the defendant at the Queen's Hospital at 12:15 A.M. on February 6, 1955, and that the defendant told him, Antonio, that on the early part of the evening of February 5, 1955, he, the defendant, went to drink beer in a beer joint on Fort Street, right above the Princess Theater; from there he said he went to 1281 Fort Street to visit his friend Domingo Toribio, who lived upstairs at that address; that he, the defendant, was there for about one hour, he then left and went downstairs and to the room of Mrs. Iwalani Boyette, where some people had been drinking beer; that the defendant joined them in drinking beer and that later an argument developed and, said the defendant, that as a result of the argument three Filipino men chased him into the lane and so he ran all the way home.

Detective Antonio further said:

"I asked him next, you have been involved in a fight more serious than that. You are supposed to have stabbed somebody, what happened with the knife? This was his answer: 'I did not

have any knife. I was the one being chased. If I had any knife do you think I get cut like this, you think I cut myself?' That was the substance. That was all the conversation I had with him on the morning on February 6, 1955 at the Queen's Emergency."

Responsive to questioning, Detective Antonio said that his questioning of Aquino, the defendant, was in Filipino, in the Ilocano dialect, as the latter is from the Ilocano section, like himself, Antonio.

Detective Antonio testified further that on the following morning, February 7, 1955, in Queen's Hospital, second floor, Leilani II, room cubicle "A," he, Antonio, again questioned Aquino, the defendant, while the latter was under police guard and that was at 9:30 in the morning. Present at the time of the questioning was police officer Earl Aku.

After the prosecutor and counsel for the defendant had approached the Bench and out of hearing of the jury, the prosecutor informed the court and counsel for the defendant that he purposed questioning the witness Antonio as to the story told him by the defendant at Antonio's second interview with the defendant and in reference to the statement later taken down in stenographic form being the same that was made in the presence of Detective Gunderson and which had been testified to by the latter. The court then informed counsel for the defendant that the latter would be permitted to do so if he wanted to go into the matter exhaustively and with the jury excluded. Counsel for the defendant responded that he had no objection but didn't know "whether it can be waived or not."

"THE COURT: First of all the signature of 'O' has to be proved up, then he can offer it in evidence as being an integration of the same story as told by Gunderson. Then at that time you can object to its being received in evidence for the reasons stated."

The prosecutor and counsel for the defendant resumed their places and the court resumed proceedings openly in the presence and in the hearing of the jury.

Pursuant to questioning, Detective Antonio having stated that the defendant was not struck or beaten, offered any reward, or immunity, to cause him to talk, and that the defendant's statements were made voluntarily to him, Antonio, the following then ensued:

"Q  What were the questions asked Mr. Aquino and the answers given to you by Mr. Aquino?

"A  At the time that I entered the room where he was confined I asked permission from the guard detailed there, which was Officer Earl Aku. I went there for the purpose of interviewing Mr. Aquino for the second time. He gave way for me to enter the door. Mr. Aquino, as soon as he saw me, he sat down on his bed, I asked him, 'Are you willing to give me a statement this morning?' He said 'Yes.' 'Are you willing to give me the same story that you gave me the other morning or different story?' 'I give you a good story this time. Maybe the first time you talked with me I was kind of dizzy. I had a headache on account of being struck here (indicating his head) by Mr. Enfiel on the left side of the head.' I said, 'If that is the case let's have your story.' Then he related the following: That on the afternoon of February 5, 1955, in the early part of the afternoon he went to drink beer at a beer joint next to the Princess Theatre. He figured out he drank about two bottles of beer. From there he went to visit some friends down at 1281 Fort Street. He figured out he stayed there about one hour. From there he went to the room of Mrs. Iwalani Boyette at 1281 Fort Street, Room No. 1 downstairs, where he joined Mrs. Iwalani Boyette, Mr. Quilas Enfiel, the victim in this case, Agcaoili Sabas, and one more Filipino, whom he only knew by the name of Felix. When the beer that these people had in the house were almost gone he went out of the room, crossed the street, Fort Street, and went to buy a case of Royal beer. With that case of beer he returned to the same room and they continued drinking. When the beer that he had bought were almost gone he claimed he stood up from his seat and was ready to leave the room. As he was about to step out from the door of Mrs. Boyette's room he stated that the victim in this case, Agcaoili Sabàs, stated to him, 'Oh, I am

not afraid of you. I can fight you any time and to a finish,' whereupon Mr. Aquino stated in return, 'I am not afraid of you too. I can fight you any time.' So right away, he stated, the victim in this case, Mr. Agcaoili Sabas, grabbed him. On account of being grabbed he grabbed him back and the two had a fist fight. The fist fight started right in front of Mrs. Boyette's room. They wheeled around, went around as far as the fence enclosure by the kitchen of the victim, and from the room they wheeled around back to the scene where they started the fight. Upon reaching there Mr. Aquino said he lost his hold on the victim in this case, who ran away to the direction of his room. In about three minutes he stated the victim, Mr. Agcaoili Sabas, returned to the scene armed with a knife in his right hand. He was indicating, and I want you to look at me because he made motions (witness demonstrating motions). When he was talking to me he said he was figuring that if he was going to run away from him the victim was going to stab him in the back, so what he did he stood his ground and waited for what was coming to him, so he said. As soon as the victim came close to him and poised the knife which he had in his right hand with a downward stroke, he claimed that he grabbed the right hand of the victim with the knife that was coming down to him and as a result he was cut right to the base of the left hand thumb. [Here the witness interpolated information he got from the doctors as to the wound in Aquino's hand.] So he held on to that despite the fact that it was bleeding and the left hand was getting weak, with the aid of his right hand he held on to the knife. They wheeled around and pretty soon they fell to the ground. They rolled on the ground makai to the fronting of the fence enclosure leading to the kitchen of the victim. From the room, he said, he was able to take away the knife from the victim. As soon as he got possession of the knife, he claimed he stabbed the victim many times on the shoulder and on the back of the neck. As he was stabbing the victim they rolled down, finally they landed in the ditch on Corkscrew Lane, that is right makai of 114 Corkscrew Lane. A few minutes later he noticed the victim was laying down on his back, he was not moving any more, so he figured out that the victim was already dead, so he climbed back from

the ditch to the top of the stone wall and as he was standing fronting the gate leading to the kitchen of the victim he claimed that Mr. Quilas Enfiel went down there armed with a three-foot length of water pipe. Right as he got close, he claimed, Mr. Enfiel was holding the water pipe with his right hand and he struck him on the left hand side of the forehead. As soon as he got struck, he claimed, he grabbed the pipe with his left hand and pulled it backward like this (witness demonstrating) and as soon as Mr. Enfiel was close he gave him one stab. As soon as he stabbed Mr. Enfiel once he claimed Mr. Enfiel ran away from the scene. Now nobody was around so what he did was to walk out from Corkscrew Lane to Fort Street, across Fort Street to the ewa side right to the front of Princess Theatre. From there he walked makai to Beretania Street, made a right turn on the mauka side of Beretania Street and walked in the ewa direction until he reached the intersection of River and Beretania Street. From there he crossed Beretania to the makai side and walked on the makai side to his room at 1183 River Street. Upon reaching the place he said he went straight to the community kitchen. He took off his bloody clothes after putting down the knife on top of a box in the community kitchen. Then he went to the sink and washed his bloody hands. He took off his clothing, went to his room, put on his robe, he wanted to go and take a bath, but then two policemen in uniform arrived and had him arrested. That was his story, sir."

Responsive to questioning, Detective Antonio testified that he next saw the defendant on the morning of February 10th "somewhere around 9:00 o'clock at the Detective Bureau; that Detective Gunderson was present; and that prior to questioning at that time the defendant was not struck, bruised, offered any immunity or reward to make him talk or if he would talk and the statements made by the defendant were voluntarily made.

Counsel for the defendant then said that, "* * * the Court need not hear this preliminary matter in the absence of the jury provided my exception noted yesterday will apply as far as this witness is concerned in every respect my objection and exceptions."

"THE COURT: Very well."

Responsive to further questioning by the prosecutor, Detective Antonio testified to the effect that the questions posed to the defendant in the morning of February 10th (1955) were "about the same," as those asked of defendant at the Queen's Hospital—on February 7—"with the exception that Detective Gunderson showed him and asked him what he knew about the knife being recovered as evidence in connection with this case, of which he said that 'it is the same knife I took away from Sabas, it is the same knife I stabbed Sabas with.' " The defendant was at the time shown and identified the knife, prosecution's exhibit "M."

Continuing his testimony, Detective Antonio identified Prosecution's Exhibit "O" for Identification as being the original copy of a statement taken from defendant on February 10, 1955, between the hours of 1:20 to 2:25 P.M., when Detective Gunderson did the questioning in English, police reporter Robert Kadota did the recording, and he, Antonio, "did the interpretation from English to Filipino, in the Ilocano dialect, and from Filipino, the Ilocano dialect to the English language."

Prosecution's Exhibit "O" for Identification was offered in evidence. Mr. King, counsel for defendant, indicated that he had not been furnished with a copy of the exhibit and would like to go over the exhibit with his client before deciding whether or not to make an objection.

A recess was taken, the prosecutor and counsel for the defendant met with the Court in Chambers and the following occurred:

"MR. KING: This confession, which is Prosecution's Exhibit 'O' for Identification, I have no objection to its being received in evidence provided I save and except my objections made yesterday in connection with Detective Gunderson's testimony that developed with respect to the 48-hour law.

"THE COURT: All right.

"MR. KING: As long as that is preserved and I have an exception to that, I will not otherwise contest the statement.

"THE COURT: All right.

"MR. KING: I will also stipulate that the signature on the last page is that of the defendant, and that his initials appear on each page of the document.

"THE COURT: Very well.

"(Whereupon Court reconvened in the open courtroom.)"

In the presence of the jury, counsel for defendant stated that he had had an opportunity to read the document—the exhibit—and had no objection to its being received in evidence saving and excepting only his objection stated to the court in Chambers.

"THE COURT: Very well. Your objection will be preserved.

"MR. KING: And an exception.

"THE COURT: Very well.

"MR. KING: I will also stipulate, if the Court please, that the signature on the last page of this document is that of the defendant, and that his initials appear on each page of the document."

Whereupon Plaintiff's Exhibit "O" for Identification was received in evidence and marked "Exhibit O" in evidence.

In substance, the several answers given by the defendant to questions asked him, as set forth in Exhibit "O," confirm what Detective Antonio testified to, *supra,* as being a statement given to him, Detective Antonio, by the defendant on the morning of February 7, 1955, in Queen's Hospital and, in addition, the further testimony, *supra,* with respect to the defendant's identification of the knife (Exhibit "M") which was shown to him when he was interviewed on the morning of February 10, 1955.

After cross-examination and redirect examination of Detective Antonio the prosecution rested. Thereupon, at the suggestion of Mr. King, counsel for defendant, the court took a recess.

During the recess the prosecutor and the counsel for defendant met with the Court in Chambers and counsel for the defendant moved for a directed verdict of acquittal on the ground "* * * that no evidence to warrant a conviction in this case has been put in before the court and jury during the Prosecution's case." The motion was denied and an exception allowed.

After the recess, Mr. King stated that the defense was ready to begin its case and thereafter called the defendant as the first witness for the defense.

Upon direct examination, the defendant testified that he was fifty-seven, a construction worker, had lived in the Territory of Hawaii "a long time," came to Hawaii in 1928, knew a man named Sabas Agcaoili, had known him about two years; met him at 1281 Fort Street, down by Corkscrew Lane, where he, defendant, used to live. Sabas "was a trouble-making man." "The way I feel that he always making trouble toward me."

Asked whether during the two-year time he had known Sabas he had ever discussed with anybody, any person, Sabas' reputation for being a trouble-maker, the defendant replied:

"A   I didn't discuss with anyone, but it is in me that he is no good.

"Q   Now, up to February 5th, 1955, did you consider Sabas a friend?

"A   Yes, we were friends but we are not so very intimate because I feel that he is always against me every time."

The further testimony of the defendant varied little, if any, from and was substantially confirmatory of what Detective Antonio had testified to as having been told to him by the defendant on the morning of February 7, 1955, at the Queen's Hospital, as hereinbefore set forth, except that the defendant in testifying as a witness on his own behalf said that he stabbed Sabas only once.

During the course of his direct examination, the defendant, in response to a question by his counsel, said that he heard and remembered the testimony of the detectives and policeman as to his arrest and also remembered hearing Detective Antonio testifying that he, defendant, had stabbed Sabas because if he did not Sabas would kill him. The significance of such testimony by the defendant is that when he was cross-examined and was asked whether he could understand English, he answered, "No," and asked if the only thing he understood was in the Ilocano language, he answered, "Yes." Also he answered "No" to the question, "You don't understand a word of English?"

Upon cross-examination the defendant was also asked and answered the question as follows:

"Q   As far as you know Sabas was so drunk that he could hardly walk, is that right?
"A   Yes."

Neil A. Donahue, Captain of Police, in charge of the Records Division of the Honolulu Police Department was called as a witness for the defendant. After he had answered some preliminary questions he was asked as to the police record of Quilas Enfiel, who had been a witness for the prosecution, and responsively he testified that the record listed a conviction of Quilas Enfiel in 1948, in the District Court of Honolulu, for being offensively armed (violation of Section 11114, Revised Laws of Hawaii 1945). However, upon cross-examination, Captain Donahue said that the record showed as to the sentence imposed, $50 fine and thirty days in jail, both suspended for the period of one year.

Court and counsel then convened in Chambers, the jury being excused until summoned, and counsel for defendant made an offer of proof to be made by Captain Donahue that the deceased Sabas had in 1942 been convicted of being offensively armed and for that served a sentence of six months in jail; 1943 was convicted of gambling; 1943 again convicted of gambling; in 1944 convicted of being a disorderly person; in 1949 convicted of being drunk; again in 1949 convicted of being drunk, in 1952 and in 1953 convicted of being drunk; that each of the drunk charges was a charge of being drunk, or intoxicated, in a public place and that with respect to the first two drunk convictions the report shows that the deceased (Sabas) was involved in an argument with other persons and that the other two drunk convictions involved a fight with other persons.

After argument by counsel, the court rejected the offer of proof and an exception was taken by and allowed to counsel for defendant.

The jury having been recalled, and being present, counsel for defendant referred to his offer of proof made in Chambers, which, for the record, was ruled upon and rejected again and was allowed an exception to the ruling thereon.

No further questions were asked of Captain Donahue and he was excused.

By stipulation there was received in evidence and marked Defendant's Exhibit 1 in Evidence, a letter dated March 6, 1957, on the letterhead of the City and County of Honolulu Health Department, by William S. Ito, M.D., Assistant City and County Physician, pertinent to the Emergency medical record showing that Policarpio Aquino of 1183 River Street had been examined by a staff physician on February 5, 1955, about 11:03 P.M., giving a description of his injuries and stating that sterile dressings were applied to his wounds and he was transferred to Queen's Hospital.

The defendant then rested.

There was no rebuttal from the prosecution, which also rested.

In the opening brief for the defendant, the several assignments of error have been treated as posing four questions for determination by this court. They are numbered I, II, III and IV, respectively. Number I incorporates defendant's assignments numbers 1, 2 and 3; number II, incorporates assignments numbers 4 and 5; number III is in respect to assignment number 6; and number IV is in respect to assignment number 7.

We shall hereinafter first comment upon and decide number IV.

"IV. Did the Circuit Court err in allowing into evidence statements of the defendant obtained by the police more than 48 hours after his arrest and before he had been charged or released, and when such detention was contrary to the '48-hour law,' Section 255-9, Revised Laws of Hawaii 1955? (Assignment No. 7.)"

The pertinent portion of Section 255-9, Revised Laws of Hawaii 1955, which is the same as was Section 10709, R. L. H. 1945, as amended by Act 185, S. L. 1953, reads as follows:

"It shall be unlawful in any case of arrest for examination * * * (e) to fail within forty-eight hours of the arrest of a person on suspicion of having committed a crime either to release or to charge such arrested person with a crime and take him before a qualified magistrate for examination."

The statute as originally compiled in the Penal Code of 1869, ch. 49, s. 9, read:

"In all cases of arrest for examination, the person making the same must conduct the party arrested before the court or magistrate empowered to take such examination, within forty-eight hours after his arrest, *except in cases where a longer delay is absolutely necessary to meet the ends of justice.*" (Emphasis added.)

The exception (the phrase above emphasized) was eliminated from the statute by the Session Laws of Hawaii 1927, Act 261, s. 1. Also, by s. 2, of the same Act, which later became Section 10710, R. L. H. 1945, and is now Section 255-10, R. L. H. 1955, it was provided that any person violating or failing to comply with any of the provisions of the previous section "shall be guilty of a misdemeanor and shall be punished by a fine not exceeding five hundred dollars ($500.00) or by imprisonment for a period of not more than one (1) year, or by both such fine and imprisonment."

Act 261 originated as House Bill No. 49 of the 14th regular session of the Territory of Hawaii, in 1927. The committee on judiciary, to which House Bill No. 49 was referred, reporting thereon under date of February 24, 1927, recommended the Bill pass with an amendment, immaterial herein, and in doing so made this comment thereon:

"The purpose of this Bill is to safeguard the citizens from abuses which have become more and more prevalent in the Police Department. Under the terms of the Bill, persons arrested on suspicion of having committed misdemeanors must be immediately charged or released, and persons having been arrested on suspicion of having committed felonies must be charged within forty-eight hours of their arrest."

Assuming that the purpose of the Act was as stated in the above-quoted paragraph from the report of the house judiciary committee of the Territorial Legislature of 1927, the instant case is not one of habeas corpus or other proceeding to require the release of the defendant herein because of his being held contrary to or in violation of the statutory provisions above quoted, and we are herein concerned with the question whether the circuit court erred in

allowing into evidence statements obtained by the police from the defendant more than forty-eight hours after his arrest and before he had been charged or released.

In the opinion of the Supreme Court of the United States, as delivered by Mr. Justice Clark, in *Crooker* v. *California,* 357 U. S. 433, at 437, it was stated that: "The bare fact of police 'detention and police examination in private of one in official state custody' does not render involuntary a confession by one so detained." Cited was *Brown* v. *Allen,* 344 U. S. 443, 476 (1953).

In *Brown* v. *Allen, supra,* the court (at p. 476) said:

> "\* \* \* Under the leadership of this Court a rule has been adopted for federal courts, that denies admission to confessions obtained before prompt arraignment notwithstanding their voluntary character. *McNabb* v. *United States,* 318 U. S. 332; *Upshaw* v.*United States,* 335 U. S. 410. Cf. *Allen* v. *United States,* 91 U. S. App. D. C. 197, 202 F. (2d) 329. This experiment has been made in an attempt to abolish the opportunities for coercion which prolonged detention without a hearing is said to enhance. But the federal rule does not arise from constitutional sources. The Court has repeatedly refused to convert this rule of evidence for federal courts into a constitutional limitation on the states. *Gallegos* v. *Nebraska,* 342 U. S. 55, 63-65. Mere detention and police examination in private of one in official state custody do not render involuntary the statements or confessions made by the person so detained. Petitioner's constitutional rights were not infringed by the refusal of the trial court to exclude his confessions as evidence."

In *Mallory* v. *United States,* 354 U. S. 449 (1957), there was a factual situation of the arrest of an accused in the afternoon and detention at police headquarters within the vicinity of numerous committing magistrates and no attempt made to take him before a magistrate until the accused confessed later that night and the accused was not actually taken before a magistrate until the following morning. The United States Supreme Court reversed the conviction, because of the introduction and admission of the confession in evidence during the trial in a federal district court, but the

conviction was reversed on the ground that the delay was a violation of Rule 5(a) of the Federal Rules of Criminal Procedure.

In *Mitchell* v. *United States,* 322 U.S. 65 (1944), the court held that a confession obtained within a few minutes after arrival at the police station did not destroy the validity of a confession not withstanding subsequent 8 days of illegal detention.

In the *McNabb* case, cited *supra,* the court said, at page 346: "The mere fact that a confession was made while in the custody of the police does not render it inadmissible." The court also said, at page 347: "In holding that the petitioners' admissions were improperly received in evidence against them, and that having been based on this evidence their convictions cannot stand, we confine ourselves to our limited function as the court of ultimate review of the standards formulated and applied by federal courts in the trial of criminal cases."

In *Gallegos* v. *Nebraska,* 342 U.S. 55 (1951), the petitioner was brought before a magistrate for the first time in 25 days after arrest and 14 days after his arrival in Nebraska. In upholding the Nebraska court in admitting petitioner's confession, the Supreme Court held that the decision and judgment below determined for the court that under the law of Nebraska such detention and examination without appearance or arraignment, "do not require exclusion of the confession or plea as involuntary. The rule of the *McNabb* case, considered recently in *United States* v. *Carignan,* 342 U.S. 36, is not a limitation imposed by the Due Process Clause. * * *."

"So far as due process affects admissions before trial of the defendant, the accepted test is their voluntariness. This requires appraisal of the facts of each particular case open to consideration by this Court."

In *United States* v. *Bando,* 244 F. (2d) 833 (USCA 2, 1957) —certiorari denied, 355 U.S. 844—citing *United States* v. *Carignan, supra,* it was held that where no coercive methods or threats or inducements to confess were employed, the statements of a defendant were admissible against him.

In the instant case, a showing was made that the several state-

ments made by the defendant when he was in police custody and prior to being charged with any offense or being taken before a magistrate, were made without protest by him and without his being at any time struck, beaten, offered immunity, or reward. Whether or not it was dictum in that case, what this court said in its opinion in *Territory* v. *Young and Nozawa,* 37 Haw. 189 (1945), is particularly applicable herein and we quote as follows:

"Assuming that the statements attributed to her were taken while she was illegally detained by and in the custody of the police, we are of the opinion that the assumed illegality of the detention does not render statements involuntary per se but, on the contrary, is merely a circumstance to be taken into consideration with all the other facts and circumstances of the case. A confession otherwise shown to have been voluntary is not rendered inadmissible by the fact that its author was under arrest or in custody at the time, even though the arrest or custody may have been under invalid process or without any process or legal right."

Even under the strict exclusionary rule practiced by the federal courts, because of the federal criminal rule, the circuit court in *Green* v. *United States,* 236 F. (2d) 708 (D. C. Cir. 1956), dismissed defendant's contention that the statements made by him while he was in the hospital was contrary to the McNabb rule and therefore inadmissible. The court stated:

"There was no unlawful detention due to failure promptly to carry him before a committing magistrate. He was arraigned just as soon as the hospital authorities released him. Delay in arraigning a suspect caused by his necessary hospitalization can hardly be called illegal detention."

Upon appeal to the Supreme Court of the United States, the case of *Green* v. *United States, supra,* was reversed, but on the ground that the defendant had been in jeopardy twice for the same offense in violation of the Fifth Amendment.

In *Krauss* v. *State,* 229 Ind. 625, 100 N.E. (2d) 824 (1951), the court held that:

"A voluntary confession obtained during a period of unlawful detention, without arraignment or preliminary hearing before a magistrate, is not inadmissible as a matter of law under the due process clause, but the unlawful detention is a fact to be considered in determining whether due process was violated."

The Indiana court cited *United States ex rel. Weber* v. *Ragen,* 7 Cir., 1949, 176 F. (2d) 579, 583, 584, and quoted what that court said in a similar situation: "The failure to present the petitioner before a magistrate without undue delay contrary to the statute of Illinois is a fact to be considered on the question of due process * * *. But such failure alone is not in and of itself a denial of due process so as to render inadmissible in evidence a confession voluntarily given as in the instant case."

In *State* v. *Jordan,* 83 Ariz. 248, 320 P. (2d) 446, the Supreme Court of Arizona held that to justify an exclusion, coercion or involuntariness must first be shown; nevertheless, the delay—in taking an arrested defendant before a magistrate—was a factor to be considered in determining such a confession.

In *Moore* v. *State,* (.... Ark. ....), 315 S. W. (2d) 907 (1958), the defendant contended that the confession obtained from him was inadmissible because his statement was obtained without taking him before a magistrate as provided by statute. The court, in sustaining the trial judge in admitting the confession, quoted from Wharton on *Criminal Evidence,* 11th Ed., Vol. 2, p. 1023, Sec. 610:

"The mere fact that a confession is made while the maker is in custody of a police officer, or even while confined under arrest, is not sufficient of itself to affect its admissibility, providing that it is otherwise voluntarily made. This rule pertains equally whether the arrest is legal or illegal.

"The fact that the confession was obtained while the accused was being held without a warrant, and before he had been carried before a committing magistrate, does not of itself make the confession inadmissible, but is a circumstance, along with all the other facts and circumstances under which the confession was made, to be taken into consideration by the jury in deter-

374

mining its voluntariness." *State* v. *Browning,* 206 Ark. 791, 178 S.W. (2d) 77, 80 (1944).

To like effect was the ruling of the court in *Davies* v. *People,* 10 Ill. (2d) 11, 139 N.E. (2d) 216 (1956); the holding of the Missouri court in *State* v. *Francies,* 295 S.W. (2d) 8 (1956); also, a like ruling in *State* v. *Bradford,* 362 Mo. 226, 240 S.W. (2d) 930 (1951); and in *State* v. *Higdon,* 30 Tenn. App. 282, 204 S.W. (2d) 754 (1947).

In *Hendrickson* v. *State,* 93 Okla. Cr. 379, 229 P. (2d) 196 (1951), this appears in the syllabus:

"The inquiry in this jurisdiction is as to the truthfulness and reliability of the confession made, and delay in arraignment does not ipso facto vitiate a confession, but if there is a question of such delay having brought about the confession, then the jury may by proper instruction be required to consider such delay in determining whether or not the confession was coerced."

In New Jersey, the Rules Governing the New Jersey Courts 1951, Rule 2:3-3 provides:

"2.3-3 Proceedings Before Magistrate

"(a) Appearance. An officer making an arrest under a warrant issued upon a complaint shall take the arrested person, without unnecessary delay, before the court or magistrate named in the warrant. A person making an arrest without a warrant shall take the arrested person, without unnecessary delay, before the nearest available magistrate. A complaint shall be filed forthwith and a warrant issued thereon."

In *State* v. *Bunk, et al.,* 4 N.J. 461, 73 A. (2d) 249 (1950), defendant Smith confessed on August 10 and was arraigned on August 24, after having been discharged from the hospital. Bunk was arrested on August 14, confessed on August 16 and was arraigned on August 23, while Jellison was arrested August 18, confessed August 19 and was arraigned August 23. The court held that:

"The arrests and arraignments of these defendants occurred before the effective date of our new rules, but giving full force to Rule 2:3-3, which provides that an accused be arraigned before the nearest magistrate without unnecessary delay, a statement or confession made by the accused is not ipso facto inadmissible solely by reason of the violation of that procedural rule. The test still remains, was the statement or confession voluntarily made?"

In *State* v. *George,* 93 N. H. 408, 43 A. (2d) 256, the Supreme Court of New Hampshire, referring to a state statute providing for arraignment before a court of justice within 24 hours, held:

"It is not necessary for us to decide that a failure to arraign promptly makes inadmissible a statement meanwhile given. See *McNabb* v. *United States,* 318 U. S. 332, 63 S.Ct. 608, 87 L.Ed. 819, *Anderson* v. *United States,* 318 U. S. 350, 63 S.Ct. 599, 87 L.Ed. 829. Our statute cannot, perforce, require that a man in the defendant's situation should be removed from a hospital to the courthouse or a prison. Sections 7 and 8 of our statute provide that after detention in a police station, the officers in charge of the station shall have certain duties with respect to putting the prisoners into touch with relatives, friends, or an attorney. None of these provisions bear upon the question of the admissibility of these voluntary statements."

In the instant case the record discloses that the trial judge was fully informed of the conditions and attendant circumstances under which the several statements and admissions were made by the defendant and satisfied himself of the voluntariness of such statements and admissions before ruling, as he did, that they were voluntarily made and were admissible in evidence. This was so as to prosecution's exhibit "O" as well as to other statements and admissions made by the defendant. There was not any evidence or indication whatsoever of ill treatment of the defendant or of offer of immunity or reward made to him to cause him to make his statements and admissions. The sole objection made and exceptions saved on behalf of the defendant to the admission of testimony as to statements and admissions by the defendant and as to the tran-

script of his statements and admissions incorporated in prosecution's exhibit "O" was that defendant was not charged with the commission of a crime or taken before a magistrate within forty-eight hours after his arrest.

Therefore, in view of the record and of the authorities cited, *supra*, this court answers defendant's question number "IV" in the negative and holds that the circuit court did not err in allowing into evidence statements of the defendant obtained by the police more than forty-eight hours after his arrest and before he had been charged or released. We deem it unnecessary to rule whether defendant's detention was, under the facts appearing from the record, contrary to the so-called "48-hour law" (now section 255-9, R. L. H. 1955), as there has been no showing whatsoever that defendant was by his detention coerced into making any of the statements and admissions testified to as having been made by him, or that his detention in any way affected the voluntariness of the statements and admissions made by the defendant.

Questions numbers "I," "II" and "III," as presented on behalf of the defendant, will be commented upon and disposed of in inverse order of their presentation.

"III. Did the Circuit Court err in refusing defendant permission to introduce evidence of the actual character and reputation of the deceased, as a person of violent nature; particularly by refusing to allow evidence of deceased's police record as to convictions and as to circumstances attending said offenses? (Assignment No. 6.)"

Defendant called Captain Neil Donahue of the Honolulu Police Department, in charge of the Records Division, as a defense witness. The expressed purpose of calling him was to adduce evidence as to the criminal record of the deceased Sabas. On objection of the prosecutor, defendant, out of hearing of the jury, made an offer of proof, as set forth *supra* in detail that Captain Donahue would testify that the record of the deceased Sabas shall show that the latter was once convicted of being offensively armed; twice convicted of gambling; once convicted of being a disorderly person; and four times convicted of being drunk; that each of the

drunk charges was of being drunk or intoxicated in a public place and with respect to the first two drunk convictions the report showed that Sabas was involved in an argument with other persons and the other two drunk convictions involved a fight with other persons; the trial judge rejected the offer of proof and rightly. There was no offer of proof that the defendant had knowledge of the record of Sabas. Further, there was no question of fact, or issue, herein, as to who was the initiator or original aggressor in the fight between Sabas and the defendant. All the evidence as to that was to the effect that Sabas started the fight, was the first to use the knife therein; there was only one knife used and that belonged to Sabas. Therefore, as properly contended by the prosecution, the defendant's state of mind would not be shown by producing in evidence the deceased's criminal record, which of itself would be irrelevant, immaterial and incompetent, because it would not in any manner assist the jury in determining the defendant's state of mind, particularly when there was no evidence of communication to the defendant of any reputation of Sabas because of his record. I *Wigmore on Evidence,* 3rd Ed., section 63, "Uncommunicated Character of Deceased in Homicide"; 26 Am. Jur., *Homicide,* § 347 at page 393; *State* v. *Roderick,* 77 Ohio 301, 82 N. E. 1082 (1907).

Defense's question number "III" is answered in the negative, as this court holds that the circuit court did not err in rejecting the offer of proof to be made by Captain Donahue of the criminal record of the deceased Sabas and in refusing to allow introduction of evidence accordingly.

> "II. Did the Circuit Court err in refusing to direct a verdict of acquittal at the conclusion of the Territory's case and again after all the evidence in the case had been submitted, because there was no evidence, beyond a mere scintilla, justifying submission of the case to the jury? (Assignments Nos. 4 and 5.)"

Question number "II" as propounded by the defendant is answered in the negative, as we find from a summation of the evidence as hereinbefore set forth, and we hold, that there was not

merely a scintilla, but with the statements and admissions by defendant, as testified to by witnesses, and also prosecution's exhibit "O," there was amply sufficient evidence to justify submission of the case to the jury. Wherefore, question number "II" propounded by the defendant is answered in the negative, and we hold that the court did not err in refusing to direct a verdict of acquittal at the conclusion of the Territory's case and again after all the evidence in the case had been submitted.

"I. Did the Circuit Court err in charging the jury on the issue of self-defense when it refused to give defendant's requested Instruction No. 8, but did give the Territory's requested Instructions Nos. 14 and 15-B? More specifically, was the law so given by the Court to the jury an erroneous and prejudicial statement of the law of self-defense as such law is recognized and adopted by the Supreme Court of Hawaii? (Assignments Nos. 1, 2 and 3.)"

Defendant asked the court to charge the jury pursuant to his requested instruction No. 8, which reads as follows:

"Defendant's Instruction No. 8

"You are further instructed that when in fear of injury, a person cannot always determine in advance the exact amount of force necessary to repel the assault, and that the defendant cannot be found guilty of exceeding his rights of self defense unless the force used was so excessive as to be clearly vindictive, under the circumstances of the case as they appeared at the time of the assault.

"In other words, the question for you to determine, is not whether the force used was actually necessary to repel the attack, or whether some other or lesser force might have been adequate, but whether the defendant, when he used the force he did, under all the circumstances, had reasonable cause to believe and did believe that such force was necessary to protect himself from impending danger of great bodily harm."

The court refused to give the instruction as requested; instead it deleted the first paragraph and gave the second only.

The Territory's requested instructions numbers 14 and 15-B read as follows:

"Territory's Instruction No. 14

"I further instruct you that self-defense, in proper cases, is the right of every person. It may be resorted to by anyone who is violently assaulted by another in such a manner as to cause the person so assaulted in good faith to believe that he is in immediate danger of either being killed or of receiving great bodily harm from his assailant, however, it must appear that the circumstances were sufficient to excite the fear of a reasonable person similarly situated and that this defendant was acting in good faith during the situation and circumstances from his standpoint and that he really acted upon the influence of such a fear and not in the spirit of illwill, hatred or revenge.

"The law of self-defense is a law of necessity pure and simple. It is not an offensive law but a defensive law. Where an assault is made, the right to resist exists, but the resistance must be in proportion to the danger which is apprehended. A person cannot be justified in using a weapon obviously and imminently dangerous to life excepting in extreme cases and no more force can be used in resisting an assault than the circumstances reasonably indicate to be necessary, and where such additional force is used the one assaulted then becomes the aggressor and is guilty of the unnecessary injury he commits; nor can one claim its benefits after he has intentionally put himself where he knows or believes he will have to invoke its aid. Circumstances justifying assault in the law of self-defense must be such as to render it unavoidable under all the circumstances, judged from the standpoint of a reasonable man placed in defendant's position, and if you believe from the evidence that this defendant could have avoided any conflict between himself and the deceased without increased danger to himself, it was his duty to avoid such conflict and so render his resort to the law of self-defense unnecessary.

"Territory's Instruction No. 15 B

"You are instructed that the right of self-defense lasts only as long as the necessity, real or apparent, for it exists. In other

words, if you find that defendant Policarpio Aquino was attacked by the deceased, Sabas Agcaoili, with a deadly weapon and a struggle ensued and during the struggle defendant Policarpio Aquino obtained possession of the weapon and, if you further find that Policarpio Aquino at that time knew or had reason to believe that his life was no longer in imminent danger, then Policarpio Aquino may not thereafter avail himself of the right of self-defense."

The court gave the above-quoted two instructions as requested by the government, over defendant's objection.

In view of the evidence and the facts disclosed thereby, we find that the defendant was not prejudiced by and that the trial court did not err in refusal to give the first paragraph of the defendant's requested instruction number "8," or in the giving of prosecution's requested instructions numbers "14" and "15-B."

As this court has often said, refusal or giving of requested instructions must be interpreted, or considered, in connection with the entirety of the court's charge to the jury. Without incumbering this opinion, by setting out in full the charge to the jury given by the trial court in the instant case, it is sufficient, we think, to say that it fairly and clearly presented the law as favorable to the defendant as he was entitled to under the testimony and evidence in the case.

Accordingly the two part question "I" propounded by the defendant is answered in the negative.

Our conclusion is that no prejudicial error was committed. We think the evidence sufficient to support the conviction for manslaughter and the judgment is therefore affirmed.

*James A. King* (*Bouslog & Symonds* with him on the briefs) for plaintiff in error.

*Lincoln J. Ishida,* Assistant Public Prosecutor (*Ernest S. Yamane,* Assistant Public Prosecutor on the brief), for defendant in error.

*Takashi Kitaoka,* Assistant Public Prosecutor, was present but did not argue.